**Michael Allen HAMILTON, Petitioner,**

v.

**Robert L. AYERS, Jr., Acting Warden of San Quentin State Prison,\* Respondent.**

**No. CIV. F–90–363–OWWP.**

United States District Court, E.D. California.

Oct. 30, 2006.

---

\* Robert Ayers is substituted for his predecessor as Acting Warden of San Quentin State Pris-

on, pursuant to Federal Rule of Civil Procedure 25(d).

Joseph Schlesinger, Federal Public Defender, Sacramento, CA, Katherine Louise Hart, Law Offices of Katherine Hart, Fresno, CA, for Petitioner.

Catherine Chatman, Raymond Louis Brosterhous, II, Office of California Attorney General, Ward Allen Campbell, California Department of Justice, Sacramento, CA, for Respondent.

Final Memorandum Decision and Order Denying Petition for Writ of Habeas Corpus and Granting in Part Certificate of Appealability

WANGER, District Judge.

Petitioner Michael Allen Hamilton ("Hamilton") first appeared in federal court June 12, 1990, requesting a stay of execution and appointment of counsel. Hamilton filed his petition for writ of habeas corpus under 28 U.S.C. § 2254 December 3, 1991, and amended his petition January 11, 1993. Hamilton was ordered to exhaust state remedies March 18, 1993, and his second state habeas petition was filed in July, 1994. After informal briefing, the California Supreme Court issued an order to show cause ("OSC") on July 17, 1996, addressing issues of juror bias and misconduct. The matter was referred to the trial court, a referee was appointed, and an evidentiary hearing was held November 4 and 5, 1997. The California Supreme Court discharged the OSC and denied the petition May 6, 1999, holding the evidence did not show the juror's failure to fully disclose her pretrial knowledge and opinions about the case resulted in the seating of a biased juror since her omissions were inadvertent, and her contemplation of her deceased uncle did not bear on her ability to be fair and was not a pretrial event which she was required to disclose in voir dire. *In re Hamilton*, 20 Cal.4th 273, 84 Cal.Rptr.2d 403, 975 P.2d 600 (1999). The remainder of Hamilton's claims in his second state habeas petition were summarily denied.

Hamilton filed his fully exhausted petition with supporting points and authorities April 14, 2000. Respondent Robert Ayers ("the State") filed an answer with supporting points and authorities July 19, 2000, and Hamilton's traverse was filed November 20, 2000. Hamilton filed his motion for evidentiary hearing December 5, 2000, and the State's opposition to an evidentiary hearing was filed January 2, 2001. The State was granted leave to file a supplemental opposition to Hamilton's motion for evidentiary hearing January 15, 2002, and Hamilton's response to the supplemental opposition was filed March 1, 2002.

Hamilton's motion for evidentiary hearing was granted in part on Claim 2b, addressing the issue of whether trial counsel's performance was deficient for failing

to present mitigating evidence. Claims 8, 10, 12, 14, 15, 21, and subclaims a, g, h, i, o, u, w, aj, ak, ao, and as, of Claim 2, were denied an evidentiary hearing and denied on the merits.[1] *See* Memorandum and Order Granting in Part and Denying in Part Motion for Evidentiary Hearing, dated November 12, 2002.

An evidentiary hearing was held December 3 and 4, 2003, at which testimony was received from *Strickland* expert Phillip Cherney, trial counsel David M. Liebowitz, defense investigator Danny Wells, and Hamilton. Following the hearing, Hamilton was allowed to supplement the record, and did so with documents filed January 26, 2004. Hamilton filed his post-hearing brief March 16, 2004, and the State filed their post-hearing brief on March 29, 2004.

The State objected to a copy of a letter by Hamilton about his background dated September 20, 1982, first submitted with the supplemental records filed January 26, 2004. *See* Ex. 133D. The State argued the late submission, fourteen years after the ineffective assistance of counsel claim was raised and after the completion of habeas discovery and the evidentiary hearing, raises serious questions about its authenticity and reliability. The State submitted a declaration from trial counsel stating he was certain he never saw this document. The State contended these issues must be resolved before any weight could be given to this document. The State's motion to reopen the evidentiary hearing was granted and a hearing addressing the limited issue of the credibility of Exhibit 133D was held September 9, 2004. Hamilton filed his supplemental brief October 26, 2004, and the State filed its supplemental brief November 2, 2004.

## I. PROCEDURAL HISTORY

Hamilton was convicted of the November 2, 1981 shooting of his wife and their unborn child. The jury found Hamilton personally used a firearm in the murders. Two special circumstances, financial gain and multiple murder, were found true as to Hamilton's wife, and the special circumstance of multiple murder was found true as to the fetus. Hamilton was sentenced to death on December 16, 1982. On direct appeal the California Supreme Court set aside one of the multiple murder special circumstances and otherwise affirmed the judgment in full. *People v. Hamilton,* 48 Cal.3d 1142, 259 Cal.Rptr. 701, 774 P.2d 730 (1989). Hamilton's first state habeas corpus petition, filed March 14, 1989, was summarily denied August 31, 1989, and certiorari was denied March 19, 1990.

## II. FACTS

In 1981, Hamilton, his wife Gwendolyn (Gwen) who was pregnant, and their four children, ages six, four, three and one, lived in Bakersfield. RT 7:1725, 1740; RT 9:2039–40. In March of that year, the Hamiltons purchased life insurance policies, $175,000 on Hamilton and $100,000 on Gwen, paying the initial premium for coverage until June. RT 7:1715–17. When they did not pay the second quarterly payment on time, the agent personally collected the payment from Hamilton, extending the policy into September. *Id.* at 1717, 1722. When the third premium was not received, the agent again visited the Hamiltons on October 17, collecting payment for two months from Gwen, extending the policies into November. *Id.*

---

**1.** The analysis of the claims denied evidentiary hearing is repeated here for continuity. The language of the original order inadvertently referred to the standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The merits of those claims have been reconsidered under the standard in effect prior to the enactment of the AEDPA and the result is not altered.

In September, Hamilton began an extramarital relationship with Brenda Burns. RT 8:1798–99. In October, he called his sister Carolyn Hamilton to ask if she knew anyone who would do something illegal for money. *Id.* at 1852–53. Later he told Carolyn he wanted someone to kill Gwen and offered her $20,000 from the insurance on Gwen's life if she would help find someone to do the killing. *Id.* at 1855, 1857–60. Hamilton told both Carolyn and his brother-in-law Lyle Palmer that he had a girlfriend, but if he left or divorced Gwen he wouldn't have his kids. *Id.* at 1857; RT 7:1744–45. Brenda's sister Sharon Burns also testified that Hamilton told her he didn't like the way Gwen was in bed, sexually, and he wanted to divorce her so he could live with Brenda. RT 8:1842.

Carolyn first asked another sister, Victoria (Vicki) Hamilton, who agreed to kill Gwen for $10,000 of the insurance money. RT 8:1861; RT 9:2045. However, Vicki moved to Texas a few days later. RT 8:1959–68. Carolyn then approached Gilbert Garay, a prior acquaintance she met when both worked as security guards for Porterville Private Patrol. *Id.* at 1856, 1865–67, 1972–77. Gilbert agreed to kill Gwen for $10,000. *Id.* at 1867, 1974–75.

On October 31, Hamilton and Brenda Burns went to K–Mart in Bakersfield and purchased a single-shot 12–gauge shotgun. RT 8:1776, 1801. Hamilton said he left his identification in the car, so Brenda purchased the gun and shells with money furnished by Hamilton. *Id.* at 1776; 1802–03, 1805–06.

That evening Hamilton, Gwen, and their children drove to Porterville to take their kids trick-or-treating with Carolyn's son. RT 8:1868. While accompanying the children trick-or-treating, Hamilton, Carolyn and Gilbert discussed plans for the murder. *Id.* at 1869–70. Hamilton told Carolyn he would start to drive his family home, but then stop on Highway 65 claiming one tire was flat, so that Carolyn and Gilbert could drive by and shoot Gwen. *Id.* at 1869–70, 1982. Carolyn and Gilbert left in Carolyn's truck a few minutes after Hamilton. *Id.* at 1981. As planned, Carolyn and Gilbert found Hamilton crouched down by the tire with Gwen standing beside him holding a flashlight. *Id.* at 1872–73. Although Carolyn drove by three to four times, Gilbert never pulled the trigger, so they eventually returned to Porterville. *Id.* at 1874, 1984–85.

Hamilton phoned Carolyn about an hour later to ask what happened. RT 8:1875. Carolyn made excuses and Hamilton said they would come back to Porterville the next day. *Id.* at 1875–76. The next day Hamilton phoned Carolyn to say he would pretend to have lost his wallet while changing the tire. *Id.* at 1876–77, 1987. Hamilton and Gwen would stop at the same place on the pretext of looking for his wallet. *Id.* at 1877, 1987. Carolyn and Gilbert would follow them and shoot Gwen as previously planned. *Id.*

That evening, Hamilton and his family again visited Carolyn, his mother and stepfather, Jacqueline (Jackie) and Sam Piper, in Porterville. RT 8:1877, 1988. Carolyn and Gilbert followed Hamilton about a half-hour after he left, and found him and Gwen at the same place, looking for the "lost" wallet. *Id.* at 1878–79, 1989. Carolyn and Gilbert drove by several times, but again Gilbert did not shoot. *Id.* at 1879–80, 1990–91. Hamilton was mad when he called Carolyn about an hour later, and she made more excuses. *Id.* at 1881.

The following day Hamilton called Carolyn with a new plan. RT 8:1882. As part of this plan, Carolyn called Gwen and told her that Hamilton's wallet had been found. *Id.* at 1993. Hamilton and Gwen for the first time left their children with Gwen's sister, who also lived in Bakersfield, and drove a white pickup truck to Porterville.

RT 7:1726–28. When they arrived, Hamilton surreptitiously gave Carolyn his wallet, so she could return it to him in front of the family. RT 8:1884. Hamilton and Carolyn went to pick up Gilbert, and Carolyn and Gilbert told Hamilton they weren't going to shoot Gwen. *Id.* at 1886–87, 1993. Hamilton said he would do it. *Id.* at 1888. Hamilton said he would be hitchhiking, and instructed Carolyn and Gilbert to pick him up and take him back to his pickup. *Id.* at 1995.

This time everything went according to the new plan. Carolyn gave Hamilton an icepick, which he used to jab a hole in one of his pickup's tires. *Id.* at 1888–89. Hamilton stopped the pickup along the highway because one tire was going flat. RT 7:1696. He left Gwen in the truck and walked along the highway, ostensibly to find a place where he could phone for help. *Id.* Carolyn and Gilbert picked him up in Carolyn's truck and drove him to a phone booth, where Hamilton called his mother and asked her to come help him. RT 8:1892, 1998; RT 7:1613. Mrs. Piper said she could not come until Carolyn returned with the truck. *Id.* at 1614. Carolyn and Gilbert then drove Hamilton back to where Gwen was waiting in the pickup. RT 8:1892, 1998. Hamilton took the shotgun, walked over to the pickup, and shot Gwen. *Id.* 1894, 2001. He returned to the truck and demanded another shell. *Id.* at 1894, 2003. After reloading, he went back and shot Gwen again. *Id.* at 1896, 2003–04.

Gilbert drove back to the phone booth where they left Hamilton. RT 8:1897–98, 2006. Carolyn returned home with the truck after she dropped Gilbert off at a friend's house. *Id.* at 1899–1900. Carolyn called Hamilton back at the phone booth and said their mother and stepfather were on the way. *Id.* at 1900; RT 7:1615. The Pipers drove Carolyn's truck to pick up Hamilton at the phone booth, and then to

where Hamilton "discovered" that Gwen had been killed. *Id.* at 1615–16.

An autopsy revealed the cause of Gwen's death was shotgun wounds to the throat and chest, fired at close range. RT 7:1677–81. The fetus was viable and died from anoxia caused by Gwen's death. *Id.* at 1682–84; RT 8:1929–30.

Hamilton first told the police that Gwen had been killed while he was hitch-hiking to the phone booth. RT 7:1695–98. The next day, however, he said that she was killed by a Canadian whom he refused to identify. *Id.* at 1699. Eventually Vicki told the police of the plan to kill Gwen. RT 9:2052–53. With Vicki's consent, the police taped two phone calls between her and Carolyn. *Id.* at 2054. Carolyn and Gilbert each confessed when they were arrested, and were each charged with two counts of first degree murder with special circumstances. RT 8:1904, 2011–12. Both Carolyn and Gilbert agreed to plead guilty to second degree murder with a dangerous-weapon enhancement, and be sentenced to 16 years to life, in return for their testimony against Hamilton at trial. *Id.* at 1904, 2013. Carolyn and Gilbert both testified at trial, identifying Hamilton as Gwen's killer. *Id.* at 1894–96, 2000–04.

At trial, the defense attempted to show that Gilbert might have been the actual killer. Lilly Bardsley, the clerk from K–Mart who testified for the prosecution that she sold the shotgun to Brenda and Hamilton, was recalled by the defense and testified instead that she sold the gun to Brenda's sister Sharon, who was accompanied by both Hamilton and Gilbert. RT 9:2145–51, 2157–68. Sharon, also recalled by the prosecution in rebuttal, denied purchasing the shotgun. *Id.* at 2177–80. The ATF form filled out at the time the gun was purchased was signed with Brenda's name, and the prosecutor presented expert testimony that the signature was in Bren-

da's, not Sharon's, handwriting. *Id.* at 2211–24. Vicki testified that when she first talked to Carolyn after the murder, she assumed Gilbert was the shooter. *Id.* at 2050. Another defense witness testified that prior to Gwen's murder, Hamilton told her he suspected Vicki and her boyfriend, Stephen Fitzherbert (who was Canadian), were planning to kill him. Hamilton stated, "Well, you know my family, if they want anything bad enough, they'll kill for it." RT 9:2138–41. Hamilton did not testify.

The jury found Hamilton guilty as charged, and found true the charged special circumstances of intentional murder for financial gain, and two counts of multiple murder. RT 10:2347–58. The penalty trial was brief. The prosecutor presented documentary evidence that ten years previously Hamilton was convicted of grand theft. *Id.* at 2373–74. Defense counsel called Hamilton's mother, who testified that as a child Hamilton had been removed from the family home because of abusive conduct by his father, and placed in a series of foster homes. *Id.* at 2382–84. Hamilton requested permission to read a statement telling the penalty jury he was not guilty, but for unspecified reasons beyond his control he was not permitted to testify or present exonerating evidence, and asking the jury to "return with the penalty described by law for the crime that you have me guilty of." *Id.* at 2374–81. Defense counsel objected, and the court refused to permit Hamilton to read the statement. *Id.* After approximately four hours, the jury returned a verdict imposing the death penalty. *Id.* at 2419–20.

### III. APPLICABILITY OF THE AEDPA; STANDARD OF REVIEW

On April 24, 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), amending Chapter 153 (28 U.S.C. §§ 2241–2255), which governs federal habeas corpus proceedings. The United States Supreme Court held the provisions of the AEDPA apply only to cases filed *after* its effective date. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under previous Ninth Circuit authority, a capital habeas corpus case was pending or filed when an application for appointment of counsel and a request for a stay of execution was filed. *Calderon v. U.S. Dist. Court (Kelly V),* 163 F.3d 530, 540 (9th Cir.1998) (en banc). However, *Woodford v. Garceau,* 538 U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003), overturned *Kelly V,* holding that only an application for habeas relief which seeks adjudication on the merits of a petitioner's claims qualifies a case as "pending" under amended § 2254(d). *Id.* at 207, 123 S.Ct. 1398.

The holding of *Garceau* does not affect the previous rulings that Hamilton is not subject to the limitations of the AEDPA. Hamilton's initial federal habeas petition, which sought adjudication on the merits of his claims, was filed on December 3, 1991. Hamilton's case was pending at the time the AEDPA was enacted and is not subject to the amendments to Chapter 153.

 Constitutional violations are categorized as either trial error or structural error. *Arizona v. Fulminante,* 499 U.S. 279, 306–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Trial errors "occur during the presentation of the case to the jury," and are amenable to harmless-error analysis because they can "be quantitatively assessed in the context of other evidence presented" to determine the effect on the trial. *Fulminante,* 499 U.S. at 307–308, 111 S.Ct. 1246. Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards," *id.* at 309, 111 S.Ct. 1246, and require "automatic reversal of the conviction because they infect the entire trial process." *Brecht v. Abrahamson,*

507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

■■■ The limited scope of federal habeas review does not warrant relief unless trial errors had a "substantial and injurious effect or influence in determining the jury's verdict" and deprived Hamilton of a fair trial in violation of his right to due process. *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710. In the rare case where a court is in "grave doubt" or "virtual equipoise" about the harmlessness of the error, the error should not be treated as harmless. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Mixed questions of fact and law require de novo review. *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988). State court findings of historical fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (effective until April 23, 1996), and are reviewed for clear error. *Jeffries v. Blodgett,* 5 F.3d 1180, 1187 (9th Cir. 1993).

## IV. PRE–TRIAL CLAIMS

### 1. CLAIM 21: COMPETENCE TO STAND TRIAL

■■■ Hamilton contends he was incompetent to stand trial and that no inquiry was made by the court, the prosecutor, or defense counsel, into his mental state even though they were on notice of his possibly disordered or impaired mentality. Competence to stand trial is a fundamental right which implicates due process. *Cooper v. Oklahoma,* 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). The test for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); *Godinez v. Moran,* 509 U.S.

389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Cases finding sufficient evidence of incompetency have entailed either extremely erratic and irrational behavior during trial or a lengthy history of acute psychosis and psychiatric treatment. *Compare Boag v. Raines,* 769 F.2d 1341, 1343 (9th Cir.1985) (no real and substantial doubt of competency because five attempted suicides were too distant from the crime, no mental impairment from repeated head injuries and alcoholism, and diagnosis as a sociopath does not affect competency); *and de Kaplany v. Enomoto,* 540 F.2d 975, 983–85 (9th Cir.1976) (no bona fide doubt of competency despite two emotional and inappropriate outbursts at trial, expert testimony of severe disturbance and paranoid schizophrenia, and a bizarre and gruesome crime); *with Tillery v. Eyman,* 492 F.2d 1056, 1057–58 (9th Cir.1974) (incompetence found where the defendant displayed erratic and irrational behavior during trial, such as screaming throughout the night, laughing at the jury, gesturing to the bailiff, disrobing in the courtroom and butting his head through a glass window); *Moore v. United States,* 464 F.2d 663, 665 (9th Cir.1972) (incompetence shown by the defendant's lengthy history of acute psychosis, repeat hospitalization for acute mental illness and hallucinations, and evidence of psychiatric treatment); and *Odle v. Woodford,* 238 F.3d 1084, 1088 (9th Cir.2001) (competency hearing required where section of Odle's brain was removed and had history of psychotic episodes, despite calm appearance in court).

■■■ On collateral review, the determination of competence is reviewed as of the time of trial. *de Kaplany,* 540 F.2d at 979–80 (evidence before the state trial judge reviewed to determine if there should have been a bona fide doubt as to competence). A claim of trial court error

requires a showing that a reasonable judge would have had a bona fide doubt as to the defendant's competence to stand trial. *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 489 (9th Cir.1997); *cf. Torres v. Prunty,* 223 F.3d 1103, 1109 (9th Cir.2000) (trial court's finding of no bona fide doubt was not supported by the record). A bona fide doubt arises if there is substantial evidence of incompetence, which includes irrational behavior, demeanor at trial, and any prior medical opinion on competence. *Amaya–Ruiz, id.; Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

Hamilton contends he had a previous psychiatric history including an admission to a psychiatric ward, was psychiatrically and neuropsychologically impaired during the commission of the crime and pre-trial detention, and suffered from major mental illnesses, all of which required professional intervention and medications while awaiting trial, including treatment for: (1) major depression; (2) suicidal tendencies with at least one attempted suicide while awaiting trial; (3) post-traumatic stress disorder; and (4) psychosis. Hamilton contends he was administered medications for depression, agitation, anxiety and emotional instability which were not supported by reliable medical or judicial determinations and were contra-indicated for a patient with hyperthyroidism and emotional instability.

■ Hamilton presents in support of this claim the opinion of George Woods, M.D., who asserts that Hamilton's mental state deteriorated during his incarceration before trial. Dr. Woods relates that Hamilton was observed by medical staff to be anxious, depressed, experienced sleep disturbances and nightmares, and was suicidal, that a psychologist noted his difficulty in concentration, blunted affect (feeling, emotion), exhaustion, sadness and tearfulness, that he was medicated with Etrafon (an antipsychotic drug), Tofranil (an antidepressant) and Benadryl, medications which could have been contra-indicated given his medical history, that he was observed by court staff and jurors to be emotionally constricted, remarkably expressionless, lacking emotion and seemingly detached, while at other times emotionally labile (unstable), weepy and suddenly uncontrollable, and that his emotional responses intensified and he began shouting and crying during a conversation with counsel after his dosage of Etrafon was increased. Dr. Woods concludes these reports point to a pharmaceutically-induced or aggravated state of confusion, agitation and inattention that likely affected Hamilton's ability to make decisions, testify relevantly, and respond appropriately to courtroom proceedings and developments, and made it extremely unlikely he would have been able to weigh and consider such issues as the advantages and disadvantages about testifying and to reach a rational decision about testifying. Dr. Woods also concludes that Hamilton's family history of genetic disorders, childhood physical and psychological abuse and atmosphere of sexual abuse, burdened him with extreme mental and emotional impairments, including serious psychiatric disorders, that compromised his ability to fully appreciate the nature and consequences of his acts or to conform his conduct to the requirements of the law. See Ex. 48.

No medical records are presented in support of this claim. Hamilton instead offers the opinion of Dr. Woods, concluding that contemporaneous observations of Hamilton's emotional state during his trial indicate Hamilton's preexisting mental condition was exacerbated by the drugs he was given, rendering it extremely unlikely Hamilton was able to make rational decisions. No declaration regarding Hamilton's competency is submitted from trial counsel.

Further, Hamilton has not cited, and the record does not show, one instance of Hamilton acting irrationally during the pretrial, trial or sentencing proceedings. To the contrary, on the three occasions when the trial court conversed with Hamilton regarding his request to be moved to an alternate cell, his *Marsden*[2] motion, and his request to read a statement to the jury, Hamilton responded appropriately and intelligently, indicating an understanding of the court's explanations. See RT May 17, 1982; RT June 22, 1982; RT 10:2374–81. Even Hamilton's proclamation of his innocence prior to sentencing indicates his ability to control his emotions and communicate, despite facing an extremely stressful event. See RT December 16, 1982.

Finally and very importantly, Hamilton has not shown that he was unable to understand the nature of the proceedings against him or to assist counsel. To the contrary, Hamilton's discourses with the trial court indicate he was fully aware of what was occurring and was able to communicate his thoughts and opinions to counsel.

Hamilton filed supplemental records on January 26, 2004, which included Tulare County Jail Medical Records from December 1981 through March 1982, as well as medical records from Kings View Clinic of a mental health evaluation on April 8, 1982, and medication orders for May through October, 1982. The jail records show that Hamilton was receiving medication for depression in March, 1982, and that it had been discontinued for an unknown reason. *See* Ex. 140. The Kings View diagnosis attributed Hamilton's blunted affect (feelings, emotions) and depressed mood to being incarcerated and charged with murder. *See* Ex. 134. The supplemental evidence does not support Hamilton's claim that he was incompetent.

When the record is viewed as a whole, the evidence presented by Dr. Woods does not raise a "bona fide doubt" as to Hamilton's competence to stand trial. Based on the evidence presented, defense counsel was not ineffective for failing to raise the issue of Hamilton's competence. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 21 is denied on the merits.

2. CLAIMS 1 & 2ab: CHANGE OF VENUE; INEFFECTIVE ASSISTANCE OF COUNSEL

Hamilton contends the trial court erred by twice denying his request to change venue. Hamilton also argues trial counsel provided ineffective assistance by failing to pursue the interlocutory appeal of the trial court's denial of his change of venue motion. Hamilton asserts the publicity before and during his trial in Tulare County was so pervasive it was not possible to impanel an impartial jury. Hamilton alleges the media coverage included grave inaccuracies, extra-judicial proof of guilt, references to inadmissable evidence, and opinions by court officers and state agents about his guilt and the appropriateness of the death penalty.

The California Supreme Court reviewed this claim on direct appeal, examining (1) the nature and extent of pretrial publicity, (2) the county's population, (3) the nature and gravity of the offense, (4) the status of the victim and of the accused in the community, (5) the existence of political overtones in the case, and the actual jury voir dire. The Court denied this claim, finding the trial court's denial of Hamilton's change of venue motion did not result in a reasonable likelihood of an unfair trial. *Hamilton*, 48 Cal.3d at 1156–57, 259 Cal. Rptr. 701, 774 P.2d 730.

**2.** *People v. Marsden,* 2 Cal.3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970).

Hamilton claims approximately 83% of the potential jurors (126 of 147) and of the impaneled jurors (10 of 12) had been exposed to the extensive media coverage of the murder. Hamilton maintains the selection of the jury and the conduct of the trial resulted in the prejudicial exposure to inaccurate, exaggerated, inflammatory publicity and extrajudicial information about his guilt or innocence. Hamilton alleges several jurors read a great deal about the case before being called for jury duty, several had extrajudicial information about fetal viability which they shared with other jurors, and one juror thought she saw Hamilton's sister near her house during trial.

 A criminal defendant is entitled to an impartial jury. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Where prejudicial publicity makes seating an impartial jury impossible, a motion for change of venue must be granted. *Harris v. Pulley,* 885 F.2d 1354, 1360 (9th Cir.1988); *Gallego v. McDaniel,* 124 F.3d 1065, 1070 (9th Cir.1997). Prejudice of the venire may be presumed or actual. On habeas review, the district court must make an independent review of the record to determine if prejudice existed which denied the petitioner a fair trial. *Jeffries v. Blodgett,* 5 F.3d 1180, 1189 (9th Cir. 1993).

*Presumed Prejudice*

 "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir.1996). Prejudice is rarely presumed "because 'saturation' defines conditions found only in extreme situations." *Jeffries,* 5 F.3d at 1189. Prejudice is not established where the nature of the news coverage was factual and not inflammatory, and the bulk of the publicity occurred months before jury selection began. *Id.*

 The evidence presented does not undermine the California Supreme Court's finding that the publicity in this case was not inflammatory nor very extensive for a crime of this magnitude. *Hamilton,* 48 Cal.3d at 1157, 259 Cal.Rptr. 701, 774 P.2d 730; Ex. 60. The submitted evidence includes news articles from three area newspapers. Six of the articles were published in first five days following the murder (through November 7, 1981) and another nine articles in the next twenty-five days (through December 3, 1981). Until the start of jury selection on October 6, 1982, ten articles were published: three in February, two in March, one in April, two each in June and September. The submitted evidence supports the state court's finding that the majority of news articles appeared immediately following the crime and almost a year before the trial, that the publicity was not persistent and pervasive, and that it did not create a reasonable likelihood Hamilton would be deprived of a fair trial. *Id.* at 1157–58, 259 Cal.Rptr. 701, 774 P.2d 730. Prejudice cannot be presumed in this case.

*Actual Prejudice*

 To establish actual prejudice, the defendant must demonstrate that the jurors exhibited "actual partiality or hostility that could not be laid aside." *Harris,* 885 F.2d at 1363. A defendant is entitled to an impartial jury, but that does not mean a jury completely ignorant of the facts. *United States v. Flores–Elias,* 650 F.2d 1149 (9th Cir.1981). "The relevant question is ... whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). A key factor in evaluating the

reliability of jurors' assurances of impartiality is the percentage of veniremen who "will admit to disqualifying prejudice." *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Prejudice was not been established where 25 per cent of the venire were excused because they indicated an opinion about the defendant's guilt. *Id.; contra, Irvin v. Dowd*, 366 U.S. 717, 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (90 per cent of venire held some opinion as to guilt, over 60 per cent were excused for cause as having a fixed opinion of defendant's guilt).

■ Here about 20 per cent, 30 of the 152 persons in the venire, were excused because they had formed a bias from the publicity about the case. Many of the potential jurors who had heard about the case but were not excused for cause had only heard Hamilton's version of the events (he had car trouble, he left to get help and returned to find his wife murdered). Actual prejudice is not established in this case. Counsel was not deficient in failing to pursue a meritless appeal of venue. The record fairly supports the California Supreme Court's denial of this claim. Claim 1 and Claim 2ab are denied on the merits.

**3.** Hamilton raises three challenges to the jury composition for which he provides no supporting evidence, factual explanation, or argument: subclaim b. that the manner of voir dire was inherently unfair; subclaim c. that jurors were from outside the geographic area of the crime; and subclaim d. that the jury was subjected to unfair and discriminatory remarks by court officers and the prosecution. These subclaims are denied on the merits as they fail to state a prima facie claim for relief and are unsupported by any facts.

**4.** Wendell Webb stated "I am personally in favor of the death sentence." On further questioning, he said his main concern was that he didn't "believe that if someone takes a

### 3. CLAIM 5: IMPAIRED RIGHT TO TRIAL BY JURY [3]

#### a. *WITHERSPOON* ERROR

Hamilton contends that jurors were excused who did not meet the *Witherspoon* standard, as they were excused without being informed of their duty to subordinate their views and follow the law. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

Hamilton does not indicate which excusals of potential jurors he objects to, and no argument is presented in support of this claim. The excusal of Mr. Skidmore was raised and rejected in Hamilton's direct appeal. The California Supreme Court found Mr. Skidmore's excusal complied with *Witherspoon* and *Witt*, because he made it unmistakably clear that, regardless of the evidence, he would not vote for the death penalty unless he was an eyewitness to the murder. *Hamilton*, 48 Cal.3d at 1165–66, 259 Cal.Rptr. 701, 774 P.2d 730.

Hamilton further asserts that the trial court erred in not excusing two "pro-death" jurors, Wendell Webb and Geneva Gholston. Although Hamilton raises this claim in his petition, the claim is not included in his supporting argument.[4]

life they should ever walk the streets again.... But as I said, my personal belief is now that eventually someone would walk the streets again." Voir Dire RT 2:392–93. After questioning by the prosecutor, Webb indicated that he could follow the law and weigh the evidence presented during the penalty phase. *Id.* at 394.

Geneva Gholston stated that her personal beliefs were not so opposed to the death penalty that she could never vote for death, and that she would weigh both alternatives of life without parole as well as death during the penalty phase. Voir Dire RT 4:1094–95. The claim as to Gholston appears to be based on information raised in Hamilton's state exhaustion petition. See Claim 6d.

■ A prospective juror is required to be excused under *Witherspoon* and *Witt* if his or her views on capital punishment would prevent or substantially impair the performance of the juror's duties. The inquiry on review is whether the finding is fairly supported by the record. *Hendricks v. Vasquez*, 974 F.2d 1099 (9th Cir.1992). A trial judge's factual finding about juror bias is entitled to a presumption of correctness under (former) 28 U.S.C. § 2254(d). *Witt*, 469 U.S. at 429, 105 S.Ct. 844; *Hendricks*, at 1103. Even assuming for the sake of argument the trial judge incorrectly denied an excusal for cause, the question is whether the jury which actually was impaneled was impartial. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

■ Hamilton has presented no evidence to overturn the presumption of correctness given the trial court's findings regarding juror bias. Further, review of the pertinent portions of the trial transcript, including the voir dire of jurors Webb and Gholston, fails to indicate the impaneled jury was not impartial. Defense counsel was not ineffective for failing to object to the jury's composition. The record fairly supports the California Supreme Court's denial of this claim. Claim 5a is denied on the merits.

e. FAIR CROSS–SECTION CLAIM

■ Hamilton alleges that Hispanics and other minorities were systematically excluded from his jury. Hamilton contends 30% of Tulare County was Hispanic in 1980–81. (The 1980 census indicates 73,290 Hispanics and 245,738 total population.) Hamilton asserts that the Tulare County jury book for 1981 contained 14% Hispanic surnames (Appendix B: 1,461 of 10,495), that his jury pool was 11% Hispanic (Appendix C: 20 of 160), and that no Hispanics were seated on his jury. Hamilton contends the county erred by using voter registration and DMV records when there was access to lists reflecting a more accurate cross-section of the population. Hamilton further asserts the county was able to control the racial/ethnic composition of panels through computerized data processing.

■ The Sixth Amendment guarantees a criminal defendant an impartial jury drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to the systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

Proof of unconstitutional discrimination has not been established by statistics showing a 10% or less absolute disparity between the group representation on the jury venire and in the community. "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is under-represented by as much as 10%." *Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79, 90–96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The 1980 census showed that the *adult* population of Hispanics in Tulare County was 24.85%. *People v. Howard*, 1 Cal.4th 1132, 5 Cal.Rptr.2d 268, 824 P.2d 1315 (1992); Appendix A (Total adult population—165,565; Hispanic adult population—

41,142 = 24.85%). The number of people with Hispanic surnames in Hamilton's jury pool was 22. (Appendix D omitted Jerry Rocha and Mary Rodarte.) The percentage of Hispanics on Hamilton's venire was 13.75% (22 of 160). These figures represent a 11.1% absolute disparity between the Hispanic representation on Hamilton's jury venire and in the county's adult Hispanic population.

Although this percentage of under-representation is slightly greater than the amount held inadequate to alone show purposeful discrimination in *Swain*, Hamilton fails to address other issues which would narrow the gap between adult population and the jury pool, such as citizenship, prior felony conviction, or the ability to speak and understand English. *See* California Code of Civil Procedure section 230 and *United States v. Torres–Hernandez*, 447 F.3d 699, 701 (9th Cir.2006) (holding a determination of under-representation must rely on evidence that most accurately reflects the jury-eligible population).

Hamilton provides no evidence to support his allegation that the disparity is due to the systematic exclusion of Hispanics in the jury selection process. In fact, Hamilton's allegation of computerized manipulation is undermined by the declaration of Steve Konishi, court administrator for Tulare County, stating that no procedures to monitor racial composition exist, nor has the county ever been required to study racial representation on jury panels. See Appendix F.

Even assuming that Hamilton has presented sufficient evidence to meet the second prong of *Duren*, there is no evidence that the under-representation was caused by a systematic exclusion of Hispanics from the jury selection process. Based on this evidence, defense counsel was not ineffective for failing to object to the composition of the jury. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 5e is denied on the merits.

#### f. *BATSON* CLAIM

Hamilton contends the prosecutor exercised peremptory challenges to remove Hispanics or other minorities, as well as persons with scruples against the death penalty, from the jury. However, Hamilton has provided no evidence, factual explanation or argument in support of this claim, instead he only lists page citations for the voir dire of Hispanics on his jury venire. See Appendix D. This claim was not raised at trial.

■ The improper exercise by a prosecutor of a peremptory challenge can deny a defendant the Equal Protection of the laws under *Batson v. Kentucky*. Although Hamilton was tried before the Supreme Court decided *Batson*, both state and federal law grounds existed under which he could have challenged the jury selection process. *People v. Wheeler*, 22 Cal.3d 258, 272, 148 Cal.Rptr. 890, 583 P.2d 748 (1978) (prosecutor's use of peremptory challenges to remove prospective jurors on basis of race violates state constitution); *Ford v. Georgia*, 498 U.S. 411, 420, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (defendant who was tried before *Batson* and raised a contemporaneous objection to jury selection based on *Swain v. Alabama* preserved a *Batson* claim for direct appeal). Under California law, a challenge to the composition of the jury based on a prosecutor's improper exercise of peremptory challenges must be made prior to the completion of jury selection, that is, before the jury is sworn or alternates are impaneled. *Wheeler*, 22 Cal.3d at 280–282, 148 Cal. Rptr. 890, 583 P.2d 748; *People v. Ortega*, 156 Cal.App.3d 63, 69–70, 202 Cal.Rptr. 657 (1984).

■ To excuse procedural default, Hamilton must establish both cause and

actual prejudice. *United States v. Frady,* 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). An attorney's ignorance or inadvertent error does not establish cause for procedural default unless the attorney's performance is constitutionally defective. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (citing *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Thus, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." *Carrier,* 477 U.S. at 486–87, 106 S.Ct. 2639. Further, the establishment of a new federal claim does not provide cause for a default if the alleged error also violated established state law and no objection was made on state law grounds. *Dugger v. Adams,* 489 U.S. 401, 407–08, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). Actual prejudice requires that Hamilton show "the errors at his trial ... worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Frady,* 456 U.S. at 170, 102 S.Ct. 1584.

■ Hamilton's failure to raise this claim during trial, when it could have been timely addressed, renders adequate review difficult, since the opportunity for the prosecutor to provide a basis for his peremptory challenges was lost. For five of the seven potential jurors with Hispanic surnames the prosecutor excused, a non-racial basis for each excusal is apparent on the face of the record. Since this claim was not raised during trial, when the prosecutor could have articulated non-racial reasons for the challenges which are not apparent from the cold record, and because Hamilton has shown no error resulting from the prosecutor's exercise of peremptory challenges which worked to his actual or substantial disadvantage, it cannot be assumed that the other two challenges were improper. Review of the record establishes that, overall, an "inference of discrimination" is not raised. *Johnson v. California,* 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). This evidence from the record that no discriminatory exercise of challenges occurred means defense counsel was not ineffective for failing to object to the jury selection process. The record fairly supports the California Supreme Court's summary merits denial of this claim. Claim 5f is denied on the merits.

## 4. CLAIM 6: JUROR MISCONDUCT

### d. FAILURE TO DISCLOSE BIAS

■ Hamilton alleges Geneva Gholston failed to disclose that prior to being summoned for jury duty she formed the opinion Hamilton was guilty, that she was motived to serve to avenge certain crimes, that she was guided by a dead uncle to impose death, and that she had extrajudicial contact with and fear of Hamilton's sister Vicki and her boyfriend Stephen Fitzherbert (who she saw parked in the alley behind her house) which prompted her to request police protection. Hamilton asserts Ms. Gholston's failure to disclose her bias violated his right to an impartial jury and prevented trial counsel from examining her to determine prejudice.

On state exhaustion, the California Supreme Court ordered an evidentiary hearing on this claim. The state trial court held, based on factual findings by the referee, that even if Ms. Gholston's voir dire answers understated her pretrial awareness and impressions about the case, particularly with respect to Hamilton's claim of a Canadian killer, her omissions did not lead to the seating of a biased juror. *In re Hamilton,* 20 Cal.4th at 298, 84 Cal. Rptr.2d 403, 975 P.2d 600. The state court found that Ms. Gholston stated on voir dire she was impartial, and *regardless of any*

*pretrial impressions,* she could and would judge the case solely on the evidence; that she has since insisted at all stages her exposure to pretrial information did not affect her fairness at trial; that the referee, after watching Ms. Gholston testify, explicitly credited her claim of impartiality. The state supreme court found the circumstantial evidence did not rebut the findings and there was no basis to conclude Ms. Gholston's failure to disclose fully her pretrial knowledge and opinions about Hamilton's case resulted in the seating of a biased juror. *Id.,* 20 Cal.4th at 301, 84 Cal.Rptr.2d 403, 975 P.2d 600.

The state court further held "the evidence provides no convincing reason to credit [Ms.] Gholston's 1994 declaration [which was prepared by a defense investigator], so lurid as to raise doubts on its face, over her subsequent [contrary] and more reasonable disclaimers both in writing and on the witness stand." *Id.* at 304, 84 Cal.Rptr.2d 403, 975 P.2d 600. Like the referee, the state court accepted Ms. Gholston's assurance that "the 1994 declaration does not accurately set forth the 'Uncle Frank' episode, and that the true experience is one which could have no bearing on her fairness as a juror." *Id.* at 304, 84 Cal.Rptr.2d 403, 975 P.2d 600. The Court also found no substantial likelihood that the alleged alley incident with Vicki Hamilton and Stephen Fitzherbert, as described by Ms. Gholston, caused her to develop actual bias against Hamilton. *Id.* at 306, 84 Cal.Rptr.2d 403, 975 P.2d 600.

Hamilton does not seek to present any additional facts on this claim, but disputes the conclusions reached by the state referee, which were adopted by the California Supreme Court. Hamilton contends the referee's findings were contrary to the facts and that he has stated a claim for relief under federal law. Hamilton asserts Ms. Gholston's bias was entrenched; that

the opinion she formed about Hamilton's guilt during the conversation with her neighbor was not superficial; that her fear of Hamilton's sister affected her decision; that the "presence" of her uncle contributed to her prejudgment of the case; that she is not a competent witness of her own mental state; and that her statements at the hearing and to investigators were demonstrative of bias. Hamilton contends Ms. Gholston was profoundly influenced by both pretrial bias and bias which developed during the trial such that he did not receive a fair trial.

The Sixth Amendment entitles a criminal defendant to a verdict rendered by impartial, indifferent jurors. To justify a new trial based on a claim of juror bias, a petitioner must show a dishonest answer was given on voir dire to a material question and that the correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (plurality opinion); *Tinsley v. Borg,* 895 F.2d 520, 524 (9th Cir.1990). A voir dire question is material when the honest response would reflect bias, prejudice or partiality against a party. *Coughlin v. Tailhook Ass'n.,* 112 F.3d 1052, 1061 (9th Cir. 1997) (finding a juror's dishonest answers on voir dire were unrelated to material questions as they did not result in any bias to the defendant); *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998) (an intentionally dishonest answer to a voir dire question is not fatal unless it indicates a bias). "Few voir dires are impeccable, and most irregularities can be shrugged off as immaterial to the fairness of the trial." *Dyer,* 151 F.3d at 984.

State-court determinations of factual issues are presumed correct unless an exception is present. 28 U.S.C. § 2254(d). The exceptions to § 2254(d)'s presumption

of correctness essentially codified the standards requiring an evidentiary hearing from *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *Thompson v. Keohane*, 516 U.S. 99, 108–09, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). If a habeas petitioner has had a full and fair hearing resulting in reliable findings, the federal court ordinarily should accept the facts as found by the state tribunal. *Id.* at 109, 116 S.Ct. 457. The determination of basic, primary, or historical facts are subject to the presumption of correctness, while the application of a legal standard, the ultimate question, generally is not subject to § 2254(d).

Here, the credibility determination by the referee accepting Ms. Gholston's testimony given at the evidentiary hearing is exclusively a factual finding, subject to the presumption of correctness. The state court's conclusions that any failure to fully disclose pretrial impressions was inadvertent, *In re Hamilton*, 20 Cal.4th at 301, 84 Cal.Rptr.2d 403, 975 P.2d 600; that the "Uncle Frank" episode was not accurately set forth in the 1994 declaration; that Ms. Gholston experienced no direct encounter with her Uncle Frank's spirit, *id.* at 302, 84 Cal.Rptr.2d 403, 975 P.2d 600; and that although it was doubtful she saw Hamilton's sister Vicki and her boyfriend Stephen near her house, any failure to disclose this brief, ambiguous incident was inadvertent, *id.* at 306, 84 Cal.Rptr.2d 403, 975 P.2d 600; are all entitled to a presumption of correctness. Hamilton has presented no evidence nor persuasive argument these presumptions of correctness should be set aside.

Whether the facts as found by the referee and state court resulted in the seating of a biased juror is the ultimate legal question, subject to de novo review. In each instance, the state court concluded after an evidentiary hearing that the undisclosed incidents experienced by Ms. Gholston did not result in the seating of a bias juror. *In re Hamilton*, 20 Cal.4th at 301–02, 306, 84 Cal.Rptr.2d 403, 975 P.2d 600. Hamilton has not shown, nor does review of the record reveal, that Ms. Gholston was biased against him. Any omissions about her pretrial impressions did not impact her ability, or stated intention, to be a fair and impartial juror. There is no evidence that any "feeling of the 'presence'" of her Uncle Frank's spirit, nor any alleged contact with Vicki Hamilton and Stephen Fitzherbert resulted in a bias against Hamilton. Nothing in the facts found by the state court indicates prejudice or partiality against Hamilton.

Based on this evidence, defense counsel was not ineffective for failing to discover and impeach Ms. Gholston's alleged bias. The record fairly supports the California Supreme Court's denial of this claim. Claim 6d is denied on the merits.

## 5. FOURTH AMENDMENT ISSUES

### a. CLAIM 13: ILLEGAL ARREST/PRE–TRIAL DETENTION

■ Hamilton contends that his arrest was without warrant or probable cause, and made solely because he discovered the crime. Hamilton asserts that law enforcement exploited his unlawful detention, preying upon his lack of sleep and food to obtain a statement in violation of his Fourth Amendment rights which was used against him at trial.[5] Hamilton argues this statement was prejudicial, in part because the fact that Gwen had been shot had not been made public, and that it was a product of his unlawful detention. Ham-

---

**5.** Detective Byrd testified Hamilton stated "a guy who was a Canadian citizen and a female subject were enroute back to Canada and that this person had done the shooting and he [Hamilton] knew that he [the Canadian] had used a shotgun to do it." RT 7:1699.

ilton also contends his arrest was merely a pretext for a warrantless search incident to arrest, allowing the seizure of his clothing and Brenda Burns' address and phone number from his wallet. Hamilton also contends he is entitled to habeas relief on this claim because trial counsel was ineffective in failing to object to the admission of the above evidence, resulting in his denial of a full and fair hearing on the claim in state court.

The issue of probable cause to support Hamilton's arrest was properly litigated prior to trial during a hearing on a defense motion to suppress. RT 1538.5 Motion, Sept. 20—21, 1982. Hamilton there argued that Brenda Burns' name and address were improperly obtained from his wallet following his unlawful arrest, and thus evidence of the shotgun and its purchase should be excluded. *Id.* at 25. To make a determination whether the seizure of Hamilton's wallet was proper, evidence was received about the basis for Hamilton's arrest. *Id.* at 47. The trial court found that there was probable cause to arrest Hamilton. *Id.* at 76–77. Further, the trial court determined that, even assuming Hamilton's arrest was without probable cause, an independent source for Ms. Burn's address existed. *Id.* at 75–76.

The question of probable cause to support Hamilton's arrest received a full and fair California Penal Code section 1538.5 hearing prior to trial. The only evidence supporting the contention that Ms. Burn's name and address were obtained from Hamilton's wallet comes from her testimony of what the officers told her. This evidence was before the trial court and fully considered in denying the motion to suppress. A claim based on the alleged violation of a Fourth Amendment right is not cognizable on federal habeas corpus unless the petitioner shows the state did not provide an opportunity for full and fair litigation of the claim. *Stone v. Powell,*

428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Woolery v. Arave,* 8 F.3d 1325 (9th Cir.1993). Since Hamilton was provided the full opportunity to fairly litigate this claim in state court, it is not cognizable on federal habeas corpus review.

█ Sixth Amendment claims of ineffective assistance of counsel based on incompetent representation with respect to Fourth Amendment issues are not barred from habeas review. *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). However, the record establishes defense counsel was not ineffective for failing to object to the introduction of Hamilton's statement, since the issue of probable cause to arrest had already been resolved by the 1538.5 suppression hearing and order. Claim 13 is denied on the merits.

b. CLAIMS 14 & 15: *MIRANDA* VIOLATIONS AND COERCED STATEMENT BY HAMILTON

Hamilton alleges in Claim 14 that he was denied sleep, food, drink and cigarettes on the night of the murder; that when he was finally allowed into a cell, he was forced to attempt sleep with a radio and the intercom playing at high volume; that he was badgered and berated by the police; that he was told Gilbert was an officer's brother and would not take the fall for the crime; that gory pictures of Gwen's and the baby's autopsies were shoved in his face; and that he was denied basic hygiene prior to making statements. Hamilton further asserts that on the third day he was in custody (not the afternoon following the murder as Detective Byrd testified), in response to a question about who might have committed the crime, he suggested a Canadian (meaning his sister Vicki's boyfriend Stephen Fitzherbert) might have had a motive. Hamilton also

contends he was not given *Miranda*[6] warnings again prior to this questioning. Hamilton argues he would not have made the statements he did in the absence of this coercion.

Hamilton asserts in Claim 15 that he was interrogated and made statements without a proper warning or waiver; that interrogation and a request for a waiver occurred after he requested counsel; and that he was interrogated, from which the police obtained statements, after he was represented by counsel.

Some of the allegations in Claims 14 and 15 are contradicted by Hamilton's own declaration of November 28, 2000. Ex. A to Motion for Evidentiary Hearing. The petition alleges that Hamilton was given no drink or cigarettes, which along with other deprivations coerced him into making the statement that a Canadian killed his wife. However, Hamilton's declaration states that after he called his Uncle Marvin to arrange for clothing for his children, he was given coffee and cigarettes. Ex. A, ¶ 21. The petition alleges Hamilton made the statement about a Canadian on November 5 or 6, just prior to his release. However, Hamilton's declaration states he made the statement about a Canadian early on the morning of November 3. *Id.* ¶¶ 22, 23. The petition alleges Hamilton was interrogated and made the statement about a Canadian after he requested and was represented by counsel. However, Hamilton's declaration states he made the statement about a Canadian on November 3, before and after the polygraph examination, *id.* ¶¶ 22–24, and that he first asked to speak to a lawyer when put in a holding cell after the polygraph examination and subsequent interview. *Id.* ¶ 30.

The allegations in the petition also are contradicted by Lt. Byrd's testimony at trial, where he related Hamilton's statement about a Canadian was made on November 3rd. RT 7:1698–99. Further, there is no evidence the police had any suspicion that Gilbert was involved in the murder before Vicki contacted the detectives around November 19th, so Hamilton could not have been coerced to make the statement about a Canadian by threats about Gilbert's police connections. Hamilton was only held for a few days after the murder: he was taken from the scene late on the second of November and first questioned about 2:30 a.m. on the third of November. RT 7:1670–76. He was released on the fifth of November. Ex. 38A to Hamilton's Pro Se Motion filed Jan. 13, 2006. Hamilton's sister Vicki informed law enforcement of the plan to kill Gwen about a week before Thanksgiving. RT 9:2074. Based on November 2nd being a Monday, RT 8:1882, Thanksgiving was on November 26. Gilbert was arrested on November 30th. *Id.* at 2011.

In addition, Hamilton made more than one statement on the record which shows his ability to communicate with the trial judge. See RT May 17, 1982:7 *et seq.* (request move to another cell due to inmate harassment); RT June 22, 1982:8 *et seq.* (*Marsden*[7] motion); RT 10:2374–81 (November 18, 1982 request to read statement to jury as part of closing argument at penalty); RT December 16, 1982:1 (statement of innocence at sentencing). No evidence has been presented showing Hamilton was prevented during trial from asserting that his statement had been coerced.

---

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**7.** *People v. Marsden,* 2 Cal.3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970) (defendant has constitutional right to state specific examples of allegedly inadequate representation in support of a motion to substitute new counsel).

 There is no evidence beyond Hamilton's self-serving statements to support these claims. Based on the total lack of evidence supporting these claims, Hamilton cannot establish defense counsel was ineffective for failing to seek exclusion of Hamilton's pre- and post-arrest statements. The contradictions between the allegations in the petition and Hamilton's own declaration, prepared just seven months following the filing of the amended petition, cast doubt on the credibility of both Hamilton's declaration and the allegations in his petition. Claims 14 and 15 are denied on the merits.

### 6. CLAIM 9: DENIAL OF MOTION TO RECUSE DA's OFFICE

 Hamilton contends the trial court improperly denied his motion to recuse the District Attorney's Office. Hamilton asserts that prior to his preliminary hearing, with the assistance of a jail employee, he informed Mr. Richmond (the district attorney who originally prosecuted his case) that he wanted to speak with him. Mr. Richmond instructed his chief investigator Mr. Tucker to speak with Hamilton. Mr. Tucker obtained a statement from Hamilton, and Mr. Richmond notified defense counsel of the contact the following day. Deputy district attorney Patrick O'Hara prosecuted the case against Hamilton. Defense counsel instituted disciplinary proceedings against Mr. Richmond with the State Bar of California, which Hamilton alleges created a direct conflict of interest between defense counsel and the District Attorney's Office.[8]

At trial Hamilton's counsel sought the prosecutor's recusal on two bases: the prosecutor's misconduct in communicating with Hamilton without his counsel's consent, and the bias arising from defense counsel's complaint against the prosecutor filed with the State Bar. The trial court denied recusal, relying on the fact that Hamilton himself initiated the contact with the prosecutor, questioning whether California Rule of Professional Conduct 7–103, prohibiting contact with a party known to be represented by counsel, applied to a public prosecutor, and questioning whether prosecutorial bias or "ill will" against a defendant constitutes a conflict of interest. RT March 2, 1982:5–18. Hamilton's counsel appealed this denial, but the claim was rejected by the Fifth District Court of Appeal and the California Supreme Court.

The California Supreme Court, on direct review, found that Hamilton—

> presented no evidence of actual antagonism on the part of the district attorney or any attorney from the prosecutor's office. He points to nothing in the conduct of the case which suggests bias against him. Under these circumstances the possibility of hidden bias engendered by defense counsel's complaint to the State Bar is insufficient to overturn the trial court's ruling.

*Hamilton*, 48 Cal.3d at 1155–56, 259 Cal. Rptr. 701, 774 P.2d 730.

Hamilton asserts that California law does not exclude from the requirements of Rule 7–103 claims by a represented party who contacted the opposing attorney or claims where the opposing counsel was a public official. Hamilton also contends that the potential for bias was grounds for recusal, and the context of this error in a capital prosecution warrants reversal of his conviction. Hamilton cites *People v. Superior Court (Greer)*, 19 Cal.3d 255, 137 Cal.Rptr. 476, 561 P.2d 1164 (1977) in support of his contention that the prosecutor's potential for bias justifies recusal. *Greer* states that a conflict disqualifies a District

---

8. The conversation between Hamilton and Mr. Tucker was not offered into evidence.

*Hamilton*, 48 Cal.3d at 1155, 259 Cal.Rptr. 701, 774 P.2d 730.

Attorney if the conflict either affects or appears to affect his ability to faithfully perform the discretionary functions of his office. However, *Greer* was superceded by statue in 1980. *See People v. Conner,* 34 Cal.3d 141, 147–48, 193 Cal.Rptr. 148, 666 P.2d 5 (1983). The standard applicable at the time of Hamilton's trial, from California Penal Code section 1424, stated that a motion to recuse may not be granted unless evidence shows a conflict of interest exists that would render it unlikely the defendant would receive a fair trial.

Hamilton has presented no evidence showing the district attorney had a conflict that affected Hamilton's ability to receive a fair trial. Hamilton contacted the prosecutor. His counsel made a complaint for misconduct against the prosecutor. There is a total absence of evidence that Mr. O'Hara, Mr. Richmond, or any other prosecutor bore Hamilton any animus, arising out of what are expected and often strategically asserted defense requests for sanctions against prosecutors in criminal cases. The record fairly supports the California Supreme Court's denial of this claim. Claim 9 is denied on the merits.

### 7. CLAIM 12: STATE INTERFERENCE WITH TRIAL PREPARATION

██ Hamilton asserts agents of the State of California, including Tulare County Sheriff's Officers, incited jail inmates against him and housed him with "problem" inmates resulting in threats and assaults. Hamilton states his complaints and legal actions were ineffectual, and he could not sleep, eat, concentrate or communicate effectively with counsel. Hamilton further contends his mental state and competence were adversely affected by the improper administration of drugs.

The record reveals that on May 17, 1982, Hamilton requested that he be moved to another cell because of harassment by other inmates. RT May 17, 1982:8–9. Judge Conn stated he would make an informal inquiry into the matter. *Id.* at 10. The record does not contain the result of the judge's inquiry, however on June 22, defense counsel stated, in response to Hamilton's *Marsden* motion, that he didn't have time to get involved in "certain aspects of the jail," that Hamilton would have to "take a certain amount of ... c___ that they dish out in the way of words," and that Judge Conn had investigated and did not perceive Hamilton's treatment as different from other inmates. RT June 22, 1982:16.

As noted above in Claim 21, neither medical records nor declaration from trial counsel were presented to support Hamilton's claim of incompetence. Hamilton instead relied on the opinion of Dr. Woods, which concludes that Hamilton's preexisting mental condition was exacerbated by the drugs he was given, rendering it extremely "unlikely" he was able to make rational decisions. Ex. 48:18.[9] The record does not show any irrational actions by Hamilton during trial, but reveals several occasions where Hamilton responded appropriately and intelligently while conversing with the trial court. See RT May 17, 1982; RT June 22, 1982; RT 10:2374–81; RT December 16, 1982.

Finally and most importantly, Hamilton has not shown that he was unable to understand the nature of the proceedings against him or to assist counsel. To the contrary, Hamilton's discourses with the trial court demonstrate he was aware of what was occurring and was able to com-

---

9. The report of Dr. Merikangas observes that Hamilton was medicated, but makes no comment that it was an improper type or dose, or that there was a resulting negative effect on Hamilton's mental state. Ex. 61.

municate his thoughts and opinions to counsel.

The record as a whole fails to support Hamilton's allegations of state interference and of improper medication. Based on this evidence, defense counsel was not ineffective for failing to further raise Hamilton's assertions of state interference or issues of improper medication affecting Hamilton's competence. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 12 is denied on the merits.

## V. TRIAL CLAIMS—GUILT PHASE

### 1. CLAIMS INVOLVING CO-CONSPIRATORS

#### a. CLAIM 10: INSUFFICIENT EVIDENCE/FACTUAL INNOCENCE

Hamilton asserts that instructions, court comments and argument led the jury to believe the beyond a reasonable doubt standard was not required to determine the viability of the fetus, but instead implied that viability only needed to be proved by a preponderance of the evidence.[10] Hamilton contends there was insufficient evidence of the fetus's viability, to support the financial gain special circumstance, to support a finding of first degree murder of either Gwen or the fetus, to support a finding that he personally used a firearm, or to establish the alleged aggravating factors.

Hamilton contends, in support of his claim that he did not kill his wife and did not know of the plan to kill her, that prior to the murder he agreed with his sister Carolyn and her friend Gilbert to assist them in the robbery of an unnamed drug dealer. Ex. 62:1, Declaration of Michael Allen Hamilton, dated November 28, 2000.

Hamilton asserts his role in the robbery was to buy a shotgun and then after the robbery to fence the stolen goods. *Id.* at 1–2. Hamilton contends that after he heard the police had discovered the paperwork for the shotgun purchase, he asked Carolyn to return the gun so he could turn it in. *Id.* at 9–10. Hamilton states that eventually Carolyn revealed she could not return the gun because Gilbert had disposed of it. *Id.* at 10. When Hamilton replied he had to tell the police about the gun to stay out of trouble, he asserts Carolyn begged him not to, admitting Gilbert had shot Gwen and she had been with him, driving the truck. *Id.*

Hamilton asserts defense counsel was ineffective for failing to investigate the timing discrepancy (a minimum of 15 minutes) in Carolyn's and Gilbert's accounts between the total time (from when Hamilton and Gwen left and Carolyn returned) and the time required for all the activities they recounted, and for failing to pursue testing to establish the lack of gunpowder residue, blow-back and/or other physical evidence on Hamilton's clothes or person from firing a shotgun. Hamilton contends prosecutorial misconduct occurred by failing to disclose secret benefits or agreements conferred on witnesses and by the knowing use of perjured testimony when his sister Vicki testified she received no promises regarding the bad check charges.[11] Hamilton points to the following discrepancies in the evidence: the conclusion that Gwen was relaxed and unalarmed despite a vehicle, occupied by people she knew, repeatedly driving by on a lonely road three nights in a row; that Vicki originally said Gilbert was the one who shot Gwen; and differing testimony

---

**10.** Fetal viability is a necessary finding for both the murder conviction and special circumstance finding. *See* RT 10:2322 (jury instructions).

**11.** See Claims 3b(1) & (2), 3c(9) below for analysis of prosecutorial misconduct claims.

about the color of the shotgun shells. Hamilton also claims that investigation of the driver of the Mustang who drove him to the telephone that night was insufficient in light of his detailed description of the car, that Gilbert had an opportunity to shower after the murder to get rid of any evidence, and that extreme acrimony existed between Hamilton and both his sisters, such that concerted action between them was unlikely and which provided a motive for his sisters to transfer blame for the murder to Hamilton.

In *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court assumed for the sake of argument that a "truly persuasive demonstration of 'actual innocence' ... would render the execution of a defendant unconstitutional ...." *Id.* at 417, 113 S.Ct. 853. However, the Court held that, due to the disruptive effect entertaining a substantive claim of actual innocence would have on the finality of capital cases, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* Alternatively, a claim of actual innocence may be a procedural gateway to allow consideration of a constitutional claim otherwise procedurally barred from federal review. *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Either claim of actual innocence requires the presentation of new, reliable evidence, such as exculpatory scientific evidence, trust-worthy eyewitness accounts, or critical physical evidence. *Id.* at 324, 115 S.Ct. 851.

The standard for a substantive actual innocence claim requires the petitioner to show by clear and convincing evidence that no reasonable juror would have found him guilty and/or eligible for the death penalty. *Sawyer v. Whitley,* 505 U.S. 333, 339, 350, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The standard for a procedural actual innocence claim requires a finding that in light of the new evidence, it is more likely than not that no reasonable juror would have convicted the petitioner. *Schlup,* 513 U.S. at 327, 115 S.Ct. 851.

Evaluating a request for evidentiary hearing on a claim of actual innocence requires a court to assess the probative force of the new evidence in light of the evidence of guilt presented at trial. *Schlup,* 513 U.S. at 331–32, 115 S.Ct. 851. This test may consider the timing of the submission and the affiants' likely credibility when determining the probable reliability of the new evidence. *Id.* at 332, 115 S.Ct. 851.

The California Supreme Court addressed the underlying basis for Hamilton's insufficient evidence allegations on direct appeal, finding that the evidence was sufficient to support the jury's finding that the fetus was viable, that although the evidence supporting the financial gain special circumstance was relatively weak it was properly admitted and sufficient to support the jury's true finding, and that although "other aggravating evidence was not overwhelming, the capital crimes themselves were exceptionally brutal." *Hamilton,* 48 Cal.3d at 1185, 259 Cal.Rptr. 701, 774 P.2d 730; *see also id.* at 1172–73, 259 Cal.Rptr. 701, 774 P.2d 730 (fetal viability), 1173–79 (financial gain special circumstance), 1185 (aggravating factor evidence) and 1187 (evidence of first degree murder). Hamilton has not pointed to any evidence which, when considered in light of the entire record, undermines the findings of the California Supreme Court. Further, the allegation the jury was mislead to believe that fetal viability could be proved by only a preponderance of the evidence is refuted by the record. The jury instructions expressly state "you must find *beyond a reasonable doubt* that the fetus

was viable." RT 10:2322 (emphasis added).

■■■ Defense counsel argued the fact that no evidence of blood or gunpowder was found on Hamilton. The implication that the lack of blood cleared Hamilton was undercut by the testimony of criminalist Steve O'Clair stating the lack of blood or blood stains on Hamilton's clothes or hands was not unusual as it is possible to shoot someone without getting blood on the shooter. RT 9:2033–35. Defense counsel was not ineffective for failing to further test for blood or gunpowder.

The allegation that Carolyn's and Gilbert's accounts of the night of the murder lack credibility because of insufficient time to accomplish all they testified to does not establish a claim of actual innocence. The time discrepancies are insignificant. Contrary to Hamilton's allegations, Carolyn did testify she looked at a clock when Hamilton and Gwen left at 8:45 p.m., RT 8:1912, neither Carolyn nor Gilbert testified Hamilton left at the two-minute warning of the Monday Night Football game, no source was provided to place the time of the two-minute warning at 9:00 to 9:05 p.m., and Gilbert testified he drove past Hamilton's truck twice, stopping the third time, but only one time drove "a ways" down Terra Bella Road.[12] RT 8:1999–2000. The minimal time discrepancy of fifteen minutes is not sufficient to support even a colorable claim in light of the conflict between the record and the allegations in the petition. Defense counsel was not ineffective for failing to investigate the timing issue.

The argument that Carolyn planned the murder and Gilbert was the actual killer was presented as a defense at trial, RT 10:2273–83, but was rejected by the jury. The allegation that extreme acrimony between Hamilton and his sisters would have made any conspiracy between them unlikely is contradicted by Hamilton's own declaration, where he contends the purchase of the shotgun and his repeated trips to Porterville were prompted by an agreement with Carolyn to rob a drug dealer. Ex. 62:1–2.

Beyond Hamilton's current assertions, no evidence shows his innocence. Even the proposed opinion of Mr. Morton, if rendered as Hamilton contends, would not render it more likely than not that no reasonable juror would have convicted Hamilton. *See* Claim 2a below. The evidence presented at trial overwhelmingly supports Hamilton's conviction. The record fairly supports the California Supreme Court's denial of this claim. Claim 10 is denied on the merits.

### b. CLAIM 8: LAW ENFORCEMENT CONFLICT REGARDING GILBERT

Hamilton contends that Detective Salazar's close friendship with Gilbert and his family resulted in a conflict of interest which affected the investigation and prosecution of this crime. Hamilton asserts that the prosecutorial misconduct set forth in Claim 3 (failure to disclose benefits to Vicki on bad check charges, failure to disclose instructions to Gilbert not to deviate from prior statement) was part of a plan to reduce Gilbert's culpability for a capital offense and afford him special, lenient treatment. Hamilton argues this plan left reasonable and obvious lines of investigation unexplored, coerced witnesses to reduce Gilbert's involvement and to give false and misleading testimony against Hamilton.

---

**12.** Carolyn testified that after picking up Hamilton on November 2 and driving to Teapot Dome Road, they drove to Hamilton's pickup and stopped. RT 8:1890–93.

■ Hamilton presents a declaration from Gilbert, stating that his plea agreement included a requirement that he testify truthfully, and that the prosecutor reviewed the statement he made to law enforcement to ensure there was nothing to add. Gilbert declares that when Lilly Bardsley identified him as being at K–Mart when the shotgun was purchased, the prosecutor threatened to withdraw his deal and reinstate the death penalty charges because that evidence made him more involved in the planning of the crime than his confession had admitted. Gilbert states the prosecutor allowed his brother to obtain rebuttal witnesses asserting he was with his child on Halloween afternoon, and then he was allowed to testify.[13] *See* Ex. 23.

A recent Ninth Circuit case found prosecutorial misconduct justified the presumption of truthfulness of a declaration recanting a co-conspirator's testimony, and establishing Smith's actual innocence claim sufficient to excuse his procedural default. *Smith v. Baldwin*, 466 F.3d 805 (9th Cir. 2006). Smith's co-conspirator signed two declarations, one seven years after the crime and one twelve years after the crime, recanting his testimony and declaring that Smith was not the killer. The government informed the co-conspirator that if he persisted with a recantation of his trial testimony on federal habeas, the plea agreement would be set aside and he could be subject to capital murder charges for the killing, but that if he reaffirmed his trial testimony identifying Smith as the murderer, the state would not pursue perjury charges against him. After conferring with counsel, the co-conspirator invoked his Fifth Amendment rights and refused to testify in the federal proceedings.

Although the holding of *Smith* appears to apply to this claim, there are significant facts which distinguish *Smith* from Hamilton's claim. First, Gilbert's declaration does not in any way clear Hamilton of responsibility for Gwen's death. There is sufficient evidence that Hamilton was the one who wanted Gwen killed, and that he solicited Carolyn, and through her Gilbert, to assist him. Even assuming Gilbert was the actual shooter, which is *not* supported by any statement in Gilbert's declaration, Hamilton and Carolyn are still equally guilty of the murder. Second, the State has made no current threat of further prosecution, and has not in any way attempted to suppress the facts presented in Gilbert's declaration. No evidence presented by Hamilton shows misconduct by the prosecution, or any constitutional error.

Gilbert's plea agreement required he testify truthfully. The prosecutor's warning to Gilbert not to deviate from his prior statement was no more than an attempt to ascertain that Gilbert had given the full truth in his statement, and to communicate the expectation that Gilbert must also tell the full truth at trial. The assertion the prosecutor was angry Lilly Bardsley identified Gilbert does not establish that the subsequent rebuttal witnesses presented false, manufactured testimony. The rebuttal witnesses' testimony was in fact consistent with Gilbert's testimony on direct examination, given long before Lilly Bardsley identified him, that he had taken his child trick-or-treating prior to going to Carolyn's house on Halloween. RT 8:1978.

Similarly, Vicki's testimony, consistent with her declaration, that Detective Salazar talked to the District Attorney to get a

---

13. Gilbert is mistaken as to the sequence of events, as Lilly Bardsley's identification of him was presented during the defense case, RT 9:2157–70, and Gilbert had already testified as part of the prosecution's case. RT 8:1970–2023.

misdemeanor disposition on her felony check charges, does not establish sufficient basis under *Brady* for failing to disclose benefits regarding her bad check charges. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Vicki's declaration does not say that those benefits were received prior to her testimony at trial. *See* Ex. 22. Even assuming the benefits were given before trial, in light of the benefits which Vicki did disclose to the jury, that she and Stephen received money to fly from Texas to California and for seven months of living expenses, it is unlikely the non-disclosure of any benefit regarding the bad check charges was material to the jury's evaluation of her credibility. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 8 is denied on the merits.

### c. CLAIM 11: ACCOMPLICE TESTIMONY

Hamilton asserts (1) the trial court erred by refusing to instruct the jury that Vicki was an accomplice as a matter of law, (2) that in light of Lilly Bardsley's identification of Sharon Burns, the jury should have been instructed to determine whether Sharon also was an accomplice, and (3) that without these errors, the case against him would lack corroboration.[14]

The California Supreme Court addressed this claim on direct review, holding the uncontradicted evidence did not show Vicki was an accomplice to murder as a matter of law. Vicki's participation was limited to two conversations with Carolyn. An aider and abettor as a matter of law must "act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *People v. Beeman,* 35 Cal.3d 547, 560, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984). The state court found the evidence regarding Vicki's intent ambiguous since she stated she would participate in the murder, suggested the appropriate weapon, but shortly after her statements moved to Texas and did not participate in the murder. Because her actions are subject to a variety of interpretations her accomplice status was properly left for the jury to determine. *Hamilton,* 48 Cal.3d at 1169–70, 259 Cal.Rptr. 701, 774 P.2d 730.

The California court did find that whether Sharon Burns was an accomplice should have been submitted to the jury, but found the error was harmless. There was no evidence Sharon intended the killing. The jury could not find Sharon was an accomplice without rejecting her testimony and finding that she did buy the gun. Since an accomplice finding could not be made without rejecting Sharon's credibility, a subsequent instruction to view her testimony with caution would have little effect. Lastly, even if all Sharon's testimony was viewed with caution, the prosecution's case would not have been affected. Sharon testified that Hamilton told her he was unhappy with his sex life with Gwen and wanted a divorce, but considerable other evidence supports that testimony. Shar-

---

14. The jury was instructed, pursuant to Cal.Penal Code § 1111, that "a defendant cannot be found guilty based on the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense;" that accomplice testimony was to be viewed with distrust; and that "an accomplice is one who is subject to prosecution for the identical offense charged against the defendant on trial." The court instructed that Carolyn Hamilton and Gilbert Garay were to be considered accomplices as a matter of law, and the jury should determine whether Victoria Hamilton and Brenda Burns were accomplices. *Hamilton,* 48 Cal.3d at 1168–69, 259 Cal.Rptr. 701, 774 P.2d 730.

on's discovery of the shotgun shells in Brenda's apartment was not significant in the case. And even if the jury concluded that Sharon purchased the gun instead of Brenda, that conclusion would do little to detract from the evidence that Hamilton used the gun to kill his wife. *Hamilton*, 48 Cal.3d at 1170–71, 259 Cal.Rptr. 701, 774 P.2d 730.

Hamilton contends that the evidence shows Vicki agreed to join the plan to kill Gwen, suggested the weapon to use, and was to have been the person to do the actual shooting, and that even after her move to Texas she still stated her intent to participate in the murder. Hamilton asserts this evidence makes Vicki equally liable as a co-conspirator, so her testimony was required to be viewed with distrust. Hamilton argues the numerous benefits Vicki received in exchange for her testimony suggest she was an accomplice. Hamilton concludes that had the court instructed Vicki was an accomplice as a matter of law the case against him would have lacked corroboration.

Hamilton further alleges the failure to include Sharon Burns in the accomplice instructions implied that Lilly Bardsley's identification of her as the purchaser of the gun was not to be believed. Hamilton contends he was prejudiced by this error since the rebuttal identification of Sharon as the gun purchaser cast doubt on the entire version of events given by the prosecution's witnesses. This notion was rejected because Brenda testified she purchased the gun for Hamilton, Sharon denied purchasing the gun, Brenda's name was on the gun purchase form, and a handwriting expert confirmed Brenda signed the gun purchase form.

The State asserts the trial court was correct to instruct the jury to determine whether Vicki was an accomplice, since the uncontradicted evidence reveals she was not an accomplice as a matter of law, and that no accomplice instruction regarding Sharon was proper since there was no evidence she knew of Hamilton's criminal purpose. The State urges that even if the instructions were erroneous, the error was unquestionably harmless since Brenda Burns testified as to Hamilton's motive, purchase of the gun, and later consciousness of guilt; and the prosecution's case remained almost unaffected without Sharon's testimony.

It is undisputed law in California that whether a person is an accomplice is a question of fact for the jury, unless there is no dispute as to either the facts or the inferences to be drawn regarding accomplice status. *People v. Tewksbury*, 15 Cal.3d 953, 960, 127 Cal.Rptr. 135, 544 P.2d 1335 (1976). Generally, federal habeas relief is not available for errors of state law, unless the error amounts to a deprivation of constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 67–69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The denial or misapplication of state procedures implicates a federally recognized liberty interest only if it results in the deprivation of a substantive right. *Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

Hamilton's contention, that if Vicki had been included in the accomplice as a matter of law instruction and Sharon included in the accomplice instructions, the result of his trial would have been different, lacks support. The evidence presented at trial of Hamilton's affair with Brenda; his financial troubles; the life insurance on Gwen; Brenda's testimony of her purchase of the shotgun for Hamilton and his later attempt to conceal that fact; Jackie Piper's testimony about his unusual visits to Porterville three days in a row; the inconsistencies in his statements to police and his prevarication about a Canadian suspect were independent evidence and sufficient

to corroborate the testimony of Carolyn, Gilbert, and Vicki. Nothing in this claim shows that Hamilton was deprived of a constitutional right.

Based on this evidence, defense counsel was not ineffective for failing to further object to the failure to instruct that Vicki was an accomplice as a matter of law or to seek Sharon's inclusion in the accomplice instructions. The record fairly supports the California Supreme Court's denial of this claim. Claim 11 is denied on the merits.

### d. CLAIMS 2a & u: INEFFECTIVE ASSISTANCE OF COUNSEL

Hamilton first asserts that defense counsel was ineffective because he failed to investigate and present evidence that others planned and committed the murder. Hamilton contends there was a conspiracy between Carolyn, Vicki, Jackie and Sam Piper to kill Gwen and then coerce Hamilton into sharing with or loaning them a portion of the insurance proceeds. Hamilton alleges that Jackie, believing she would be repaid by the insurance, funded Vicki's travel to Texas so Vicki could talk Stephen into shooting Gwen. Hamilton asserts that Carolyn convinced Hamilton to buy the shotgun for another purpose, that when Vicki and Stephen did not return from Texas, Carolyn convinced Gilbert to act as the shooter, and that Vicki contacted the police because Carolyn attempted to exclude her and Stephen from sharing in the insurance. Hamilton states that Patti Ketchum saw Gilbert "anxiously brush past her" upon returning after the murder, shower and carry away his soiled clothes, Ex. 27, ¶ 17; Ex. 16, ¶ 5 (declaration of Ron Stafford), and that Vicki confirmed Gilbert was the one who shot Gwen. RT 9:2050, 2079. Hamilton asserts counsel failed to subpoena phone records of Jackie, Brenda, Hamilton's residence, and the phone booth to impeach the witnesses' claims, failed to hire a ballistics expert to show the absence of gun powder residue and blood on his clothes and hands pointed to someone else as the shooter, and failed to locate witnesses to show Hamilton was looking forward to the birth of his fifth child with Gwen and was not in terrible financial straits.

As stated below in Claim 2, in order to establish an ineffective assistance of counsel claim, a petitioner must show: that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Gilbert's actions as related by Patti Ketchum (brushing past her and showering) also can be consistent with just witnessing (instead of performing) a murder. Gilbert taking his clothes away does not conclusively imply that gunpowder/blood was on them, but could be seen as reasonable since he was not living with Patti at that time. Vicki's statement that Carolyn said Gilbert did the shooting was introduced at trial and fully argued by the defense in closing. RT 9:2279–81, 2292. Expert testimony presented the opinion that the lack of gun powder residue and/or blood on Hamilton did not exclude him as the one who shot Gwen. *Id.* at 2034–35. The absence of gun powder residue or blood tying Hamilton to the shooting also was argued by the defense in closing. RT 10:2286. Testimony regarding Hamilton's history of paying his debts even when money was tight was presented at trial and also argued in closing. *Id.* at 2284, 2287, 2296–97.

 Hamilton has presented no evidence supporting the allegation that his mother and step-father, Jackie and Sam Piper, were involved in any way in the conspiracy. As observed by the State, Hamilton has failed to come forward with phone records or witnesses to his happiness about Gwen's latest pregnancy to

show prejudice from counsel's failure to investigate and present this evidence. Even if expert testimony was now presented stating the lack of blood and/or gunpowder residue exculpates Hamilton, this would only cumulate the expert testimony and argument presented to the jury at trial. In light of the damaging testimony by Vicki, Carolyn and Gilbert, the blood spatter and gunpowder residue evidence were not so consequential as to change the outcome. That Carolyn planned the murder and carried it out with Gilbert's assistance was the main defense Hamilton presented at trial. It was defense counsel's main argument in closing and was rejected by the jury. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2a is denied on the merits.

Second, Hamilton alleges that defense counsel was ineffective because he failed to make motions in limine regarding damaging, inadmissible evidence, the tape of the phone call between Vicki and Carolyn, photos and testimony about the crime scene and victims, and Hamilton's statements. See Claims 4a and 4b below and Claims 14 and 15 above. As discussed separately, all this evidence was properly admitted. Counsel cannot be ineffective for failing to seek exclusion of this admissible evidence. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2u is denied on the merits.

e. CLAIMS 3a(6), (11) & (14): IMPROPER ARGUMENT BY PROSECUTOR

Hamilton alleges the prosecutor misstated the law during argument to the jury by expressing his opinion that as a matter of law Vicki could not be prosecuted as an accomplice. Hamilton also alleges the prosecutor improperly argued that Carolyn's hearsay statement was admitted as a prior consistent statement and could be considered to prove the truth of the matter, when it was admitted only for limited purposes. Lastly, Hamilton alleges the prosecutor misstated witness testimony, e.g., that Carolyn testified Hamilton committed the murder for financial gain, when she gave no such testimony. See Claim 2g below.

■ A prosecutor's improper argument does not justify federal habeas relief unless it so infects the trial with unfairness as to make the resulting conviction a denial of due process. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson,* 74 F.3d at 1576 (citing *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Moreover, prosecutorial comments to which a defendant fails to object are reviewed for plain error. *Jeffries,* 5 F.3d at 1191.

■ First, the prosecutor's statement that Vicki was not an accomplice as a matter of law was not misconduct as the trial judge made that specific legal ruling in submitting the issue of Vicki's accomplice status to the jury for decision. The record fairly supports the California Supreme Court's denial of this claim. Claim 3a(6) is denied on the merits.

■ Second, defense counsel, during cross-examination of Carolyn, asked whether she told Vicki that Gilbert did the shooting. RT 8:1910. Carolyn denied making such a statement. *Id.* Gilbert also denied being the actual killer. *Id.* at 2022. Later Vicki testified she had "assumed" Gilbert was the killer because she was to have been the shooter and Gilbert took her place in the plot. RT 9:2050. The prosecution then introduced over objection a tape recording of a November 27, 1981 telephone conversation between Vicki and Carolyn, where Carolyn said that Hamilton, not Gilbert, shot Gwen. *Id.* at 2061–63.

The conversation was admitted as a prior consistent statement under an exception to the hearsay rule. *Id.* at 2062, 2101–02.

Defense counsel's objection impliedly asserted that Carolyn's testimony, stating Hamilton and not Gilbert did the shooting, was a recent fabrication made to minimize her and Gilbert's role in the murder. *Hamilton,* 48 Cal.3d at 1168, 259 Cal.Rptr. 701, 774 P.2d 730. The issue is whether the admitted conversation took place "before the bias, motive for fabrication, or other improper motive is alleged to have arisen." *Id.* The California Supreme Court, addressing this claim on direct appeal, found that at the time Carolyn made the taped statement she had consistently denied all involvement in the crime, but Hamilton was under arrest so she might have already anticipated arrest and reasoned that her involvement in the murder would appear less if Hamilton instead of Gilbert were the triggerman (although this was unlikely). *Id.* The state supreme court observed the testimony did not explore Carolyn's state of mind at the time of the conversation, so arguably, the prosecution failed to show that the statement was made before the motive for fabrication arose, however, any error was found harmless. *Id.*

Hamilton contends the prosecutor improperly urged the taped conversation could be considered to establish the truth of Carolyn's assertion that Hamilton shot Gwen when in fact it was admitted on a limited basis. The record, however, does not reflect that any limiting instruction was given as to the taped telephone conversation, but in fact the court's instructions told the jury that prior consistent statements could be considered for the truth of the facts as stated. RT 10:2313. Even assuming, arguendo, this instruction and therefore the argument by the prosecutor were erroneous, Hamilton cannot show prejudice since the taped conversation duplicates testimony given by Carolyn and Gilbert at trial. The record fairly supports the California Supreme Court's denial of this claim. Claim 3a(11) is denied on the merits.

■ Third, the California Supreme Court concluded the prosecutor's misstatement, attributing the statement to live testimony instead of the tape which was played for the jury, did not prejudicially affect the outcome of the trial because it was clear that Carolyn said Hamilton wanted to kill Gwen for money. *Hamilton,* 48 Cal.3d at 1178, 259 Cal.Rptr. 701, 774 P.2d 730. The record fairly supports the California Supreme Court's denial of this claim. Claim 3a(14) is denied on the merits.

f. CLAIMS 3b(1), (2) & (4): KNOWING USE OF PERJURED TESTIMONY

Hamilton asserts the prosecution presented perjured testimony by failing to disclose consideration given to Vicki and Carolyn, and by insisting that Gilbert not deviate from his prior statement.

Under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "the suppression by the prosecution of evidence favorable to an accused [*Brady* evidence] violates due process where the evidence is material either to guilt or to punishment." There are two general types of *Brady* evidence: knowing use of perjured testimony, and failure to disclose exculpatory evidence. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Presentation of false evidence violates due process and requires a new trial. *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This is so

even where the prosecution does not solicit the false information but only allows it to go uncorrected, *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), irrespective of the good or bad faith of the prosecution. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "The principal [underlying *Brady* ] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted, but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.*

■ The knowing use of perjured testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392. This is equivalent to the *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) harmless error standard. *Bagley,* 473 U.S. at 679–80 n. 9, 105 S.Ct. 3375. *See also Napue,* 360 U.S. at 267 n. 2 and 271–72, 79 S.Ct. 1173 (finding the primary witness testified falsely, the prosecutor knew he did so, and in light of the record showing insufficient evidence without the witness's testimony, a new trial was required).

■ Hamilton alleges the prosecution failed to disclose consideration given to Vicki in exchange for her testimony, specifically that she would not be prosecuted for conspiracy to commit capital murder; that she received a favorable disposition of insufficient fund check charges pending against her (i.e., her warrants were cleared, and a misdemeanor disposition was secured on felony charges); that Stephen was not deported; and that she was protected from loss and/or prosecution for an accident while driving a police vehicle. Ex. 22. As discussed in Claim 8 above, it is unclear that the favorable disposition of

the bad check charges occurred before her testimony, and even if it did, in light of the benefits of airfare from Texas to California and seven months of living expenses she received which were disclosed, it is unlikely the additional disclosure would have been material. Similarly, Vicki's statement in her declaration that the prosecutor agreed not to deport Stephen is cumulative of impeachment evidence which was disclosed, and not material to her credibility. Lastly, that Vicki was not held responsible for the alleged accident in Detective Salazar's vehicle is not material to her credibility. It is not reasonably likely that any of the alleged undisclosed benefits, individually or collectively, even if they had been disclosed to the jury, would have affected the judgment. The record fairly supports the California Supreme Court's summary denial on state habeas of this claim. Claim 3b(1) is denied on the merits.

■ Hamilton asserts consideration was given to Carolyn in the form of favorable treatment while she was in custody and special treatment for her and her son J.R. which was not disclosed. Ex. 25. Hamilton contends the undisclosed benefits were that Carolyn's son was allowed to visit her in jail and a picture of them together was taken; that Carolyn was allowed to wait in a jury room prior to a hearing where Gilbert's family brought them food; and that Carolyn was allowed out of her cell more than other people charged with murder before the trial.

Even assuming these alleged benefits were bestowed to Carolyn, in light of the damaging disclosures she made about her involvement in the murder, it is unlikely the disclosure of these minor benefits were material to her credibility or would have affected the judgment of the jury. The record fairly supports the California Supreme Court's summary denial on state

habeas of this claim. Claim 3b(2) is denied on the merits.

Hamilton contends the prosecution made it a condition of Gilbert's plea bargain that he not deviate in his testimony from the prior statement given to the police, which allegedly precluded the defense from discovering Gilbert's ability to describe the shooting in vivid detail, to impeach his trial testimony. Ex. 23. As discussed in Claim 8 above, the prosecutor's requirement that Gilbert not deviate from his prior statement was not misconduct. For a prosecutor to condition immunity on the witness testifying truthfully and not committing perjury is not prohibited. No limit was placed by the court on the type of cross-examination of Gilbert at trial. The record fairly supports the California Supreme Court's summary denial on state habeas of this claim. Claim 3b(4) is denied on the merits.

### g. CLAIMS 3c(8) & (9): *BRADY* VIOLATION

Hamilton asserts the prosecutor's failure to disclose the requirement that Gilbert adhere to his prior statement, as well as the additional benefits granted to Vicki violated *Brady*. As discussed in Claims 3b(2), 3b(4) and 8 above, even assuming the prosecutor should have disclosed the disputed evidence, it was not material and its lack of disclosure did not violate due process in light of the extent of the benefits which were disclosed to the jury. Defense counsel was free to inquire whether any limits had been placed on Gilbert's testimony. The record fairly supports the California Supreme Court's summary denial on state habeas of this claim. Claims 3c(8) and (9) are denied on the merits.

### h. CLAIM 3e: PATTERN OF PROSECUTORIAL MISCONDUCT

Hamilton contends the prosecutor engaged in a pattern of misconduct, in order to shift the blame for Gwen's murder from Gilbert to Hamilton, by requiring that Gilbert not deviate from his prior statement, see Claim 8 above, and by coercing Brenda Burns to make a statement consistent with the prosecution theory and to testify in accordance with that statement although it did not reflect her recollection. See Claim 3b(3) below. As discussed above, a requirement that Gilbert not deviate from his statement does not provide the basis for constitutional error. As discussed below, the record does not support the allegation that Brenda's testimony was coerced. The record fairly supports the California Supreme Court's summary denial on state habeas of this claim. Claim 3e is denied on the merits.

### i. CLAIM 4a: ADMISSION OF HEARSAY

Hamilton argues the taped conversation between Vicki and Carolyn was admitted in violation of California law. Hamilton asserts admission of a hearsay statement under the prior consistent statement exception requires either that there was an intervening inconsistent statement admitted to attack credibility, or that a charge of recent fabrication or bias has been made and the statement was made before any motive to fabricate arose. Hamilton contends the phone call between Vicki and Carolyn that was played for the jury failed to meet either of these requirements.

Federal courts have no authority to review claims that a state's evidentiary rules were violated, but can only determine if the admission of evidence rendered the trial so fundamentally unfair as to violate due process. *McGuire*, 502 U.S. at 72, 112 S.Ct. 475; *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir.1998). Even if evidence was admitted in violation of a state rule of evidence, due process is not violated unless the evidence is "of such quality as necessarily prevents a fair trial." *Id.* at

1103 (citing *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir.1986)). However, a state court finding that an evidentiary admission was harmless error is a question of law or a mixed question of law and fact, not a factual finding entitled to a presumption of correctness. *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988).

The California Supreme Court addressed this claim on direct appeal, finding that although the evidence showed defense counsel implied Carolyn's statement from the taped phone call, that Hamilton not Gilbert did the shooting, was a recent fabrication the prosecution arguably failed to show the statement was made before the motive for fabrication arose by not exploring Carolyn's state of mind. The state high court found that any error, however, was harmless. The California Supreme Court found although Carolyn's statement rebutted Hamilton's theory that Gilbert fired the fatal shots, the admission of the taped conversation was not significant due to the absence of any evidence to support Hamilton's theory. Even if the taped conversation had been excluded, the jury would still have heard the testimony of Carolyn and Gilbert that Hamilton was the actual killer, their unequivocal denial that Gilbert was the killer, and no contrary testimony or evidence whatever. *Hamilton*, 48 Cal.3d at 1166–68, 259 Cal.Rptr. 701, 774 P.2d 730.

The State contends the taped conversation was properly admitted to counter the defense's charge of recent fabrication, since any motive to fabricate did not arise until Carolyn was confronted with her involvement in the murder when she was arrested. The State asserts even if the taped conversation was admitted in error, it was harmless since there was no evidence that Gilbert shot Gwen and the evidence against Hamilton was strong.

From a temporal and logical perspective, Carolyn had no incentive to falsely accuse Hamilton shortly after the murder. The exact time of Carolyn's prior statement, and whether it was made before any motive to fabricate arose, was not precisely established. Even if the statement was not made before a motive to fabricate arose, the admission of the taped conversation did not render Hamilton's trial fundamentally unfair. Both Carolyn and Gilbert testified at trial to the same matters discussed in the taped conversation, that Hamilton was the one who actually shot Gwen. Even assuming the taped conversation was erroneously admitted, it does not justify habeas relief. The record fairly supports the California Supreme Court's denial of this claim. Claim 4a is denied on the merits.

2. **CLAIM 2: INEFFECTIVE ASSISTANCE OF COUNSEL AT GUILT PHASE**

A petitioner must satisfy two components to establish an ineffective assistance of counsel claim: that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The deficient performance prong requires a showing that counsel's errors were so serious that he was "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. The question is whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. There is a "strong presumption that counsel's performance falls within the 'wide range of reasonable professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Every effort must be made to "eliminate the distorting effects of hind-

sight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Bonin v. Calderon,* 59 F.3d 815, 833 (9th Cir.1995).

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, a petitioner must show counsel's failures prejudiced his defense. *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527 (citing *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052). The prejudice prong requires a showing of reasonable probability that without counsel's unprofessional errors the "result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Hamilton presents the following instances which he claims resulted in ineffective assistance of counsel:

a. failure to investigate and present evidence that others planned and committed the murder,

b. failure to investigate and present mitigation (psychological disorders, physical/sexual abuse, addiction),

c. failure to investigate and present issues from Claims 5–7, 10–15, 20–21 (impartial jury, juror misconduct, unreliable penalty, factual innocence,[15] accomplice testimony, state interference with trial, illegal arrest, coerced statements, *Miranda* violations, improper aggravation, incompetence),

d. failure to object to admission of hearsay evidence regarding financial gain special circumstance,

e. failure to object to instruction on financial gain special circumstance and accomplice corroboration,

f. failure to object to instruction regarding motive,

g. failure to object to prosecutor's misstatement of evidence regarding financial gain,

h. failure to object to prosecutor's misleading argument that no mitigation equals aggravation,

i. failure to object to prosecutor's argument in favor of the death penalty based on mathematical weighing,

j. submission of erroneous instructions regarding financial gain special circumstance and accomplice corroboration,

k. failure to investigate and present guilt/penalty issues,

l. failure to research and demonstrate the death penalty is excessive based on inter-proportionality,

m. failure to research and demonstrate the death penalty is excessive based on intra-proportionality,

n. failure to prepare defense to aggravation,

o. failure to investigate and present evidence of deal with prosecution witness,

p. failure to adequately cross-examine accomplice witnesses,[16]

q. failure to investigate and present forensic evidence of Hamilton's innocence in the shooting,[17]

r. failure to investigate and present evidence of unequal treatment of accomplices,

s. failure to impeach and exclude witness testimony,

t. failure to object to jury composition,

---

**15.** This portion duplicates the issue presented in subclaim a.

**16.** This subclaim refers to conduct presented in Claim 11, and duplicates subclaim c.

**17.** This subclaim duplicates issues presented subclaim a.

u. failure to make motions in limine regarding damaging, inadmissible evidence (tape of phone calls, crime scene and victim photos and testimony, Hamilton's statements, evidence seized in violation of Fourth Amendment),

v. failure to obtain discovery,

w. failure to object to prosecutor's and judge's misstatements during voir dire,

x. failure to investigate constitutionality of means to prepare jury roll,

y. failure to prevent continuation of conduct in section XIII,[18]

z. failure to raise incompetence,[19]

aa. failure to procure psychological/neurological exam, research and present evidence of sanity, incompetence or diminished capacity,[20]

ab. failure to prosecute writs regarding denial of change of venue,

ac. failure to cross-examine regarding gun powder residue tests,[21]

ad. failure to adequately prepare for closing argument,

ai.[22] failure to object to admission of damaging, inadmissible evidence (knife, disc removed from body, shotgun and shells),

aj. failure to object to admission of excluded news reports and their use in closing argument,

ak. failure to object to prosecutor's argument in closing of facts not in evidence and of excluded evidence, in effect "testifying" as a criminal law expert,

al. unreasonable stipulation to use of Carolyn's taped statement, the only statement that Hamilton wanted his wife killed for the insurance money,

am. unreasonable stipulation to use of prior testimony at penalty instead of recalling witnesses to point out inconsistencies in testimony,

an. failure to object at penalty to evidence regarding Hamilton's prior crime,

ao. lack of competence—no assistance, conflicting caseload, and first capital trial,

ap. appellate counsel's failure to raise federal grounds, instead relying on state grounds,

aq. failure to interview known witnesses,

ar. inadequate knowledge of relevant law,

as. failure to object to prosecutor's inaccurate and out of context statements,

at. failure to investigate to support tactical decision for any alleged error.

The State urges that all but seven subclaims should be dismissed because they are conclusory and fail to state a prima facie case.[23] Hamilton's points and authorities address the failure of counsel to properly investigate his background and mental state (subclaim b: failure to investigate and present mitigation, i.e., psychological disorders, physical/sexual abuse, addiction and subclaim aq: failure to interview known family and other mitigation witnesses), his incompetence (subclaim c: Claim 21–failure to raise incompetence), and his mental state at the time of the murder (subclaim b: failure to investigate and present mitigation). Subclaims a, b, o

18. It is not clear what conduct is referred to here, as the petition does not contain a "section XIII." If the reference is to Claim 13, this subclaim duplicates subclaim c.

19. This subclaim duplicates subclaim c, as the issue of Hamilton's incompetence is contained in Claim 21.

20. This subclaim duplicates subclaim b.

21. This subclaim raises issues presented in Claim 10, and duplicates subclaim c.

22. Subclaims ae, af, ag and ah duplicate subclaims d, g, h, and w respectively.

23. The State contends that only subclaims a, b, k, n, z, aa and aq are addressed in Hamilton's points and authorities.

and aq are argued in the petition. See pages 7–12, 12–15, and 16–17. Sufficient reference is made in the petition and/or the state record to determine the bases for subclaims c, g, h, i, l, m, p, u, y, ab, ac, ad, ai, aj, al, and ao.

Subclaims d, e, f, j, k, n, r, s, t, v, w, x, ak, am, an, ap, ar, as, and at, to the extent that they present allegations not discussed in other claims, are denied on the merits as they fail to state a prima facie claim upon which relief may be granted. Subclaims a and u are discussed above with the claims involving Hamilton's co-conspirators. Subclaim c is discussed in Claims 5–7, 10–15, 20 and 21. Subclaim ab is discussed above in the analysis of Claim 1. Subclaims p, q, y, z, aa, ac, ae, af, ag, and ah are denied on the merits as they present claims which are included in other subclaims of Claim 2.

### g. FAILURE TO OBJECT TO PROSECUTOR's MISSTATEMENT OF EVIDENCE REGARDING FINANCIAL GAIN

In his closing argument during the guilt phase, the prosecutor stated Carolyn Hamilton "testified on the stand" that the killing was for money and that she "told Vicki that [Hamilton] was going to kill Gwendolyn for the insurance money." RT 10:2256. Hamilton alleges defense counsel's failure to object to this misstatement constitutes ineffective assistance of counsel.

The California Supreme Court addressed this claim on direct appeal, finding that defense counsel's failure to object to the prosecutor's misstatement of financial gain evidence during closing argument did not constitute ineffective assistance of counsel since it did not result in the withdrawal of a potentially meritorious defense. *Hamilton*, 48 Cal.3d at 1177, 259 Cal.Rptr. 701, 774 P.2d 730. The state court found, in spite of the fact that Caro-

lyn made this statement to a police detective instead of to her sister and that it came before the jury through a taped confession instead of direct testimony, that it was clear she stated that Hamilton stated he wanted to kill his wife for the money, so the credibility of the statement was not significantly affected. *Id.* at 1178, 259 Cal. Rptr. 701, 774 P.2d 730. The state court concluded that the prosecutor's misstatement, and defense counsel's failure to object to it, did not prejudicially affect the outcome of the trial. *Id.*

Hamilton does not present any offer of proof or other showing which indicates defense counsel's failure to object resulted in ineffective assistance of counsel, nor that in any other way refutes the state court's analysis of the record. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2g is denied on the merits.

### o. FAILURE TO INVESTIGATE AND PRESENT BENEFITS GIVEN TO PROSECUTION WITNESS

Hamilton alleges defense counsel's failure to uncover evidence of the prosecution's undisclosed consideration to Vicki in exchange for her testimony resulted in ineffective assistance of counsel. See Claims 3b(1) and (8) above. As discussed above, there was no prosecutorial misconduct, so defense counsel cannot have provided ineffective assistance by failing to uncover the alleged additional benefits.

Hamilton does not present any offer of proof or showing which indicates defense counsel's actions resulted in ineffective assistance of counsel. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2o is denied on the merits.

**ad. FAILURE TO ADEQUATELY PREPARE FOR CLOSING ARGUMENT**

Hamilton argues that defense counsel's failure to prepare for closing argument resulted in a rambling, nearly incoherent presentation which left major inconsistencies and arguments unaddressed. Review of defense counsel's closing argument reveals not a "rambling, nearly incoherent presentation," but repeated attacks on inconsistencies in the testimony of Carolyn, Gilbert and Vicki, bolstering the theory that they planned and carried out Gwen's murder and then framed Hamilton.

Hamilton does not present any offer of proof or showing which indicates defense counsel's actions resulted in ineffective assistance of counsel. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2ad is denied on the merits.

**ai. FAILURE TO OBJECT TO ADMISSION OF DAMAGING, INADMISSIBLE EVIDENCE**

 Hamilton contends defense counsel's failure to object to the admission of damaging, inadmissible evidence, including a knife, shot cups removed from Gwen's body, the shotgun pieces, and shotgun shells, was unreasonable and resulted in ineffective assistance of counsel. Hamilton asserts testimony established the knife had no connection to the case, the shot cups were not identified and had no foundational chain of custody, and the shotgun and shells were not shown to have been used in the murder.

The knife, People's Exhibit No. 29, was taken from Hamilton at the crime scene, tested by criminologist Steven O'Clair and determined not to have made the hole in

the tire of Hamilton's pickup truck. RT 8:1769; RT 9:2029–30. The shot cups (which are the part of shotgun shells that hold the pellets together until they leave the barrel of the gun, RT 8:1771) were removed from Gwen's neck and chest during the autopsy, tested by O'Clair and determined they could have come from a 12–gauge shotgun with number 8 shot. RT 8:1770–71, RT 9:2031–33. The shotgun parts were found where Gilbert said he disposed of them, RT 7:1966, RT 8:2008–09. The serial number on the recovered shotgun part matched the serial number on the ATF form of the sale to Brenda Burns on October 31, 1981. RT 8:1777–78; 1788.

Hamilton does not present any offer of proof or showing which indicates any undue prejudice from admission of this evidence, or that defense counsel's failure to object resulted in ineffective assistance of counsel. Further, Hamilton does not present any basis for the allegation that any of this evidence was inadmissible. See Claim 4e and f below. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2ai is denied on the merits.

**aj. FAILURE TO OBJECT TO ADMISSION OF EXCLUDED NEWS REPORTS, USE IN CLOSING ARGUMENT [24]**

Hamilton contends defense counsel failed to object when a properly excluded news release was put into evidence, and again failed to object when the prosecutor referred to that evidence in closing argument.

 Review of the record reveals defense counsel did object to the admission

---

24. This claim is amended from the denial on November 12, 2002, due to additional review of the record.

of the news release into evidence, and the trial court ruled it was not admitted. RT 9:2100. Review of the prosecutor's arguments to the jury reveals that although reference was made to the news release, the argument was based on the testimony of Lt. Byrd, who related Hamilton's statement that he knew Gwen was shot with a shotgun because he saw a news release, and indicating the news release stated Gwen was shot, but did not reveal the type or caliber of weapon. RT 10:2263, RT 7:1700–01. These references to a news release were invited by Hamilton's post-arrest statement to Lt. Byrd which made reference to the news release as bearing on whether such a news release existed as related to the credibility of Hamilton's post-arrest statement. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2aj is denied on the merits.

### al. UNREASONABLE STIPULATION TO USE CAROLYN'S TAPED STATEMENT

Hamilton contends that the tape of Carolyn's November 27, 1981 confession to Detective Salazar included the only statement that Hamilton wanted to kill his wife for the insurance money, and that defense counsel's stipulation to playing the tape for the jury resulted in ineffective assistance of counsel. RT 8:1960.

The California Supreme Court addressed the underlying admission claim on direct appeal and held that since Carolyn's statement was admissible, it was not necessary to consider whether counsel's failure to object to its admission denied Hamilton constitutionally effective assistance of counsel. *Hamilton,* 48 Cal.3d at 1175 n. 21, 259 Cal.Rptr. 701, 774 P.2d 730.

█ Carolyn testified at trial that Hamilton said he wanted his wife killed because he had a girlfriend and he wanted his kids. Similarly, in her taped confes-

sion Carolyn stated that Hamilton wanted to kill Gwen for the insurance money and because he had a girlfriend. Even assuming the taped confession was improperly admitted, and that defense counsel erred in not objecting to its admission, there was no prejudice because the implication that Hamilton wanted the life insurance money was presented by Carolyn's in-court testimony that Hamilton offered her $20,000 from the insurance proceeds if she assisted him with the murder. Hamilton cannot show that defense counsel's failure to object resulted in ineffective assistance of counsel. The record fairly supports the California Supreme Court's denial of this claim. Claim 2al is denied on the merits.

### ao. LACK OF PROFESSIONAL EXPERIENCE IN CAPITAL CASE TRIALS

Hamilton contends that defense counsel provided him constitutionally ineffective assistance of counsel since this was his first capital trial, he had no assistance, and he was attempting to defend other capital murder trials and major felony cases during Hamilton's trial.

Hamilton does not present any offer of proof or other showing which indicates defense counsel was not competent to represent a capital defendant. The record fairly supports the California Supreme Court's summary denial of this claim. *See also* analysis below of Claim 2b. Claim 2ao is denied on the merits.

### aq. FAILURE TO INTERVIEW KNOWN WITNESSES

Hamilton asserts that defense counsel was ineffective for failing to interview known witnesses. However, Hamilton does not specify in the petition or supportive briefing which witnesses counsel knew of and did not interview, or what their testimony would establish, nor does he

present any offer of proof or other showing how defense counsel's actions resulted in ineffective assistance of counsel. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2aq is denied on the merits.

### 3. CLAIM 3: PROSECUTORIAL MISCONDUCT

#### a. IMPROPER ARGUMENT

Hamilton asserts the prosecutor made improper statements during argument which undermined the basic fairness of his trial. This claim asserts the prosecutor: (1) made graphic, prejudicial, inflammatory remarks; (2) misstated the law on fetus viability; (3) misstated evidence regarding the behavior of alleged accomplices; (4) argued fetal murder by a preponderance of the evidence; (5) inaccurately argued Hamilton made admissions; (7) gave improper opinion that Sharon's boyfriend Don Van Eck's testimony connected Hamilton to the crime; (8) improperly stated that Hamilton had a motive for murder; (9) improperly stated the elements of murder; (10) argued Hamilton originally intended to carry out the murder in front of his children; (12) inaccurately argued the defense presented no evidence on key points; (13) misstated the nature of the financial gain special circumstance, its necessary proof, and argued irrelevant facts; and (15) improperly usurped the jury's role and "testified" as a criminal law expert.[25]

■ "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson,* 74 F.3d at 1576. A prosecutor's argument, even though improper and universally condemned, does not justify federal habeas relief unless it so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden,* 477 U.S. at 181, 106

S.Ct. 2464. Moreover, prosecutorial comments to which a defendant fails to object are reviewed for plain error. *Jeffries,* 5 F.3d at 1191.

Subsections (1) and (12), that the prosecutor made graphic, prejudicial, inflammatory remarks, and inaccurately argued no evidence was presented on key defense points, are not supported by specific allegations or citations to the record. Review of the record does not reveal that the prosecutor's argument was improper, or inconsistent with the evidence presented at trial. These claims are denied on the merits as they fail to state a prima facie claim upon which relief may be granted and are unsupported by record references.

Subsections (2), (5) and (9), that the prosecutor misstated the law on fetus viability, inaccurately argued Hamilton made admissions, and improperly stated the elements of murder, lack specific allegations or citations to the record. Review of the state record reveals that the language used by the prosecutor mirrors the language of California's jury instructions. RT 10:2245 and 2322; *id.* at 2243 and 2322, 2324. Subsections (2), (5) and (9) are denied on the merits.

Subsections (3), (4), (8) and (13), that the prosecutor misstated evidence regarding the behavior of the alleged accomplices, argued fetal murder by a preponderance of the evidence, stated Hamilton had a motive for murder, and misstated the necessary proof for the financial gain special circumstance and argued irrelevant facts, are not supported by specific citations to the record. Review of the state record reveals that the argument by the prosecutor regarding the accomplices, Hamilton's motive, and the financial gain special circumstance was consistent with the evidence presented at trial. RT 10:2265–71

**25.** Subsections (6), (11) and (14) are discussed above in Part V.1(e).

and 2254–56. The prosecutor's argument about fetal viability told the jury they "must find *beyond a reasonable doubt* that the fetus was viable." *Id.* at 2241 (emphasis added). There is no error. Subsections (3), (4), (8) and (13) are denied on the merits.

 Subsections (7) and (10), that the prosecutor stated his opinion that Van Eck's testimony connected Hamilton to the crime, and argued Hamilton originally intended to carry out the murder in front of his kids, are both confirmed by the record. RT 10:2265 and 2050–51. Hamilton alleges these statements by the prosecutor were improper, intended only to inflame the jury, and infected the trial with unfairness. Defense counsel's objection to Van Eck's testimony, that on November 3, 1981, he saw Hamilton with an "older" woman in a white pickup, *id.* at 1751–52,[26] was overruled. RT 7:1756. Although the testimony by Van Eck may not have "overwhelmingly" connected Hamilton to the crime, it did provide a connection and as such the prosecutor's argument did not render the entire trial unfair. The argument of intent to carry out the murder in front of the children was consistent with and did not misrepresent the evidence presented at trial. The trial judge twice warned the jury, once prior to counsels' closing arguments and once during the instructions, that statements of counsel were not evidence. RT 10:2238–39, 2308. Subsections (7) and (10) are denied on the merits.

 Subsection (15), that the prosecutor argued at both guilt and penalty that it was hard to conceive of a more cold-blooded, calculated murder, is confirmed by the record and the circumstances of the killing. RT 10:2304 and 2388. Defense counsel did not object to this argument during the guilt phase, but did object at the penalty phase. The trial court sustained the objection, but indicated the prosecutor's comment was proper if submitted as argument instead of personal belief. *Id.* at 2388. The prosecutor indicated that he was submitting the statement as argument only. *Id.* Hamilton alleges the argument effectively allowed the prosecutor to give his personal opinion about the evidence, which allowed him to "testify" as a criminal law expert on the ultimate issue of guilt, thus improperly usurping the jury's role and infecting the trial with unfairness.

The prosecutor's argument is premised on a reasonable inference that the murder was carried out for Hamilton's selfish pecuniary gain after two aborted attempts. Even assuming this statement was an improper comment on the weight of the evidence against Hamilton, any error was later cured by the instructions to the jury that they alone were to determine the facts based on the evidence presented at trial, RT 10:2306, and that the statements and argument of counsel were not evidence. *Id.* at 2238–39, 2308. The trial court's instructions were sufficient to focus the jury's attention on the proper issues. *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir.1986). Subsection (15) is denied on the merits.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 3a is denied on the merits.

b. KNOWING USE OF PERJURED TESTIMONY

(3) BRENDA BURNS' COERCED/REHEARSED TESTIMONY AND CONSIDERATION

Hamilton asserts Brenda Burns was permitted to give testimony which the

---

**26.** Don Van Eck was 21 at the time of Hamilton's trial in October 1982; Gwen was 26 at the time of her death and the mother of 4 children ages 6 and younger. RT 7:1752; 1737, 1725.

prosecutor knew to be false, misleading and unreliable because it had been coerced and repeatedly rehearsed without regard for whether it reflected her independent memory of events. Hamilton also alleges Brenda's testimony misleadingly failed to disclose that she was testifying in exchange for explicit and implicit promises that she would not be charged for capital murder and that county authorities would not take custody of her children.

Hamilton presents a supporting declaration by Brenda Burns, asserting she was questioned by detectives for hours until she gave the answers she thought they wanted, that she was given a lie detector test which she was told she failed, that she was instructed to memorize her statement before she testified, and that when she testified to something not in her statement she was shown her statement so she could change her answer. Ex. 28.

To justify a new trial under *Brady v. Maryland* for knowing use of perjured testimony, the false evidence must be material, i.e., reasonably likely to affect the judgment of the jury. 373 U.S. at 87, 83 S.Ct. 1194.

Hamilton's allegation of coercion is not supported by the record. Contrary to her declaration, Brenda Burns' testimony at trial contains three instances where she was asked to examine the statement she gave to the police in order to refresh her recollection, however only one instance resulted in her correction of an incorrect answer. RT 8:1821–27 (correcting response that she did not call Carolyn at Hamilton's request). The other two instances where she was asked to review her statement to police, was to refresh her recollection following her answers that she "did not recall." *Id.* at 1818–19 and 1833–36.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 3b is denied on the merits.

### c. FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

Hamilton alleges the prosecutor failed to: 1) disclose names and addresses of all witnesses who might have been called to testify or who gave statements to the police, including consulted experts; 2) provide access to all physical evidence obtained and information, including felony conviction records, regarding prosecution witnesses (i.e., whether they were on probation/parole, had any pending charges, were given money, immunity or other promises, had prior false charges or statements); 3) disclose the existence of taped conversations made for the Tulare County Sheriff between Patti and Vicki; and 4) disclose Brenda's failed polygraph exam with evidence of extensive coaching and threats.

The failure to disclose exculpatory and impeachment evidence favorable to the defense is material if there is a "reasonable probability" that had the evidence been disclosed to the defense "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 668, 104 S.Ct. 2052. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. *Bagley* materiality is not a sufficiency of the evidence test. *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555.

Hamilton fails to show any witness information which is material, that had it been disclosed the result of the trial would have been different. Further, there is no indication that the reports, records, or other

physical evidence Hamilton challenges ever existed. Assuming such information existed, there is no evidence any of it was exculpatory evidence mandating disclosure to the defense. Hamilton has failed to make any showing that any physical evidence to which he refers existed which should have been disclosed. More importantly, Hamilton has not shown that any undisclosed evidence was material or that the result was an unfair trial.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 3c is denied on the merits.

### d. WITHHOLDING, MISREPRE-SENTING, AND FAILING TO PRESERVE EVIDENCE

Hamilton contends the prosecution withheld, misrepresented, and failed to preserve potentially exculpatory evidence, including blood and gun powder residue, test results of Hamilton and his clothing, the tires of Hamilton's station wagon and truck, and the polygraph tests administered to Hamilton and other witnesses. None of this alleged evidence, however, has been identified as having been in the possession of law enforcement or located during this proceeding, or in any other case which has reviewed Hamilton's conviction. Repeated requests of habeas counsel and continual investigation have not revealed such evidence.

 Due process is not violated by the mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant. *United States v. Hernandez,* 109 F.3d 1450, 1455 (9th Cir.1997); *Arizona v. Youngblood,* 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The failure to preserve evidence which is only potentially exculpatory violates due process only if the evidence's exculpatory value was apparent before it was destroyed, the defendant would be unable to obtain comparable evidence by other reasonably available means, and the police acted in bad faith in failing to preserve the potentially useful evidence. *Hernandez,* 109 F.3d at 1455; *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333.

Hamilton has shown no facts which would support an allegation that the prosecution, or law enforcement, acted in bad faith by failing to preserve evidence or that evidence he seeks existed or is in existence. Further, Hamilton has not shown that any of the evidence or tests he describes possessed any exculpatory value. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 3d is denied on the merits.

### 4. CLAIMS 4b, c, d, e, & f: ADMISSION OF EVIDENCE ERRORS

Hamilton claims inadmissible, prejudicial evidence was admitted which infected the trial with fundamental unfairness. Hamilton challenges the admission of graphic photographs of Gwen and the fetus, as well as their autopsies; the unduly graphic testimony of officers which related the discovery of Gwen's body and detailed the scene; and the knife taken from him at the scene, the shotgun and the shells, since evidence showed the knife could not have been used in the commission of the crime and the shotgun and shells were never connected with the crime. Hamilton contends all this evidence was irrelevant and more prejudicial than probative.

Hamilton also raises a challenge to evidence for which he provides no factual identification, explanation, specification, or argument: that "unreliable, false or irrelevant evidence of prior bad acts or crimes" was admitted. Claim 4c is denied on the merits as it fails to state a prima facie claim for relief.

■ As noted above in Claim 4a, an evidentiary admission only justifies federal habeas relief if the admission renders the proceedings fundamentally unfair. *McGuire,* 502 U.S. at 72, 112 S.Ct. 475; *Windham,* 163 F.3d at 1103. Evidence which is probative of an element of the crime may be introduced whether or not that element is specifically contested by the defense. *McGuire,* 502 U.S. at 69–70, 112 S.Ct. 475. The trial court has broad discretion to admit photos of the murder victim. *People v. Price,* 1 Cal.4th 324, 441, 3 Cal.Rptr.2d 106, 821 P.2d 610 (1991). The prosecution is not obligated to rely solely on testimony or accept an antiseptic stipulation. *Kealohapauole,* 800 F.2d at 1466 (finding no denial of due process from admission of a videotape of autopsy procedure). Photographs which disclose the manner in which a victim was wounded or killed are properly admitted on the issue of malice. *United States v. Goseyun,* 789 F.2d 1386, 1387 (9th Cir.1986).

Hamilton has presented no evidence showing that the trial judge abused his discretion in allowing admission of the challenged evidence, or that the admissions made his trial unfair. Claims 4b, d, e, and f are denied on the merits.

5. CLAIM 6: JUROR MISCONDUCT AT GUILT PHASE

a. EXTRANEOUS INFORMATION RE: FETAL VIABILITY

Hamilton contends that the jury, in determining the multiple murder special circumstance, relied on extraneous information which was irrelevant and unreliable to resolve the issue of fetal viability. Hamilton asserts consideration of this information failed to provide him the opportunity to refute it and created an impermissible risk of conviction based on materially false and misleading evidence.

■ Hamilton presents the declarations of two jurors, Allen Peoples and Ma-

bel Heguigaray, saying that they personally knew of babies born at seven months who survived and that some unidentified women on the jury related knowledge of similar experiences. Ex. 31, ¶ 5 and Ex. 32, ¶ 3.

■ Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. *United States v. Navarro–Garcia,* 926 F.2d 818, 821 (9th Cir.1991); *People v. Marshall,* 50 Cal.3d 907, 950, 269 Cal.Rptr. 269, 790 P.2d 676 (1990). When jurors receive information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found not prejudicial. *In re Carpenter,* 9 Cal.4th 634, 647, 38 Cal.Rptr.2d 665, 889 P.2d 985 (1995). A petitioner is entitled to habeas relief only if the extrinsic evidence had a substantial and injurious effect or influence on the verdict. *Lawson v. Borg,* 60 F.3d 608, 612 (9th Cir.1995).

The extraneous information Hamilton complains of was based upon past, pretrial, personal experiences of the jurors, and was not the subject of outside, independent research or from an authoritative extrinsic source. Further, it duplicated information which was testified to at trial, and did not have a substantial and injurious effect or influence on the verdict.

Based on this evidence, defense counsel was not ineffective for failing to investigate and present evidence of juror misconduct. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 6a is denied on the merits.

c. FAILURE TO INFORM COURT OF JUROR CONVERSATION WITH DETECTIVE SALAZAR

■ Hamilton asserts that Juror Peoples violated the trial court's admonition not to discuss the case with anyone or to

speak to witnesses when he initiated a conversation with Detective Salazar outside the courtroom. Hamilton presents the declaration of Juror Peoples in support of this claim, where Peoples admits being acquainted with Detective Salazar, that on the day the jury was sworn Peoples called out to Salazar saying he recently found an old newspaper photo of him, to which Salazar laughed and they went their separate ways. Ex. 31, ¶ 3. Juror Peoples also declares he assumed that the trial judge lectured the jury not to talk to witnesses the next day because of this incident. *Id.*

The state record reveals that the "lecture" by the trial judge was the standard admonition given on the same day the jury was sworn in. RT 7:1595–99. If Juror Peoples is mistaken about when the incident occurred and he talked to Detective Salazar the day before the "lecture," that was prior to any admonition given by the judge. Even if the incident occurred after the jury was admonished, the conversation related by Juror Peoples is innocuous, did not concern the trial or any issue in it, and could not have had a substantial and injurious effect or influence on the verdict.

Based on this evidence, defense counsel was not ineffective for failing to investigate and present evidence of juror misconduct. The record fairly supports the California Supreme Court's summary denial of this claim. Claims 6c is denied on the merits.

## VI. *TRIAL CLAIMS—PENALTY PHASE*

### 1. CLAIM 2: INEFFECTIVE ASSISTANCE OF COUNSEL AT PENALTY PHASE

#### b. FAILURE TO INVESTIGATE AND PRESENT MITIGATION

Hamilton asserts defense counsel failed to investigate and present evidence from his background, including evidence of multi-generational sexual abuse and symptoms of psychiatric disorders, suicide and alcohol/drug addiction, his father's physical and psychological abuse of the entire family, his early and continuing symptoms of psychic trauma, dissociative behavior, extreme anxiety and depression which went untreated, his parents' arrests for sexual exploitation of Carolyn and his subsequent foster care placement, his attempted suicide prior to trial, and the probability he suffers from organic trauma. Specifically, Hamilton contends defense counsel was ineffective since he did not consult any mental health specialists or present any expert testimony of his psychiatric history, and failed to locate his childhood evaluations of psychological trauma and schizophrenic paranoid disturbances. Exs. 50 and 40.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. In assessing whether counsel's investigation was reasonable, an objective review must be conducted of their performance "under prevailing professional norms." *Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.... [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

*Deficient Performance*

Hamilton presents in support of this claim eighteen declarations by family members and friends detailing the chaotic and abusive environment in which he grew up, as well as records documenting his early mental health evaluations. Exs. 2–5, 7–10, 12–14, 17–20, 22, 24–25. He also presents a social history prepared by Shir-

ley A. Reece, M.S.W., who interviewed Hamilton and members of his family in 1993 and 1994, and reviewed numerous documents. Ms. Reece states that Hamilton was raised in an environment of inter-generational alcoholism, child abuse and domestic violence, that much of the adult behavior he was exposed to was and is proscribed by law, and that there was seemingly a total lack of familial or social supports. Ms. Reece observes there is abundant evidence that all the children were severely deprived in every sense and lacked the normal affectional bonds and guidance which foster healthy development and prosocial behavior, that the ongoing stress far exceeded Hamilton's coping capabilities and he literally had nowhere to turn for help. Ms. Reece states that Hamilton was repeatedly subjected to gross maltreatment and incredible psychological abuse, and that his parents' behavior was by all reasonable standards both deviant and depraved. Ms. Reece concludes that without a doubt Hamilton is the product of an extraordinarily dysfunctional and pathological family, which contributed substantially to his behavior and to his functioning as an adult. Ex. 47.

Hamilton also presents the opinion of Dr. Woods, who interviewed Hamilton and reviewed numerous documents. Dr. Woods states that Hamilton has had serious psychiatric disorders which substantially altered his ability to understand and function, that both sides of Hamilton's family have histories of genetically transmitted disorders which expressed themselves early in Hamilton's life, and that any ability Hamilton had to function normally was destroyed by a constant barrage of life-threatening and degrading treatment at the hands of his parents. Dr. Woods states Hamilton's mental health was severely damaged by repeated physical and psychological abuse directed at Hamilton and others, and his sense of hopelessness, learned helplessness, and chronic anxiety have their roots in times he was forced to witness sadistic attacks against family members and was unable to help them. Dr. Woods opines that Hamilton is incapable of meaningfully engaging others and must either retreat into isolation or surrender to the influence of people around him. Dr. Woods concludes that as a result of environmental, developmental and traumagenic factors beyond his control, Hamilton has been burdened throughout his life with extreme mental and emotional impairments which compromised his ability to fully appreciate the nature and consequences of his acts or to conform his conduct to the requirements of the law. Ex. 48.

Hamilton asserts trial counsel failed to interview family, friends, and others with whom he had contact, about his background or family history of psychiatric disorders and alcohol and drug dependency, failed to obtain evidence about his childhood and any psychologically traumatic events, and failed to obtain a psychiatric or psychological exam or any psychiatric records. Hamilton maintains trial counsel's performance fell below an objective standard of reasonableness and violated the duty to obtain mental health exams and to investigate his background.

Hamilton argues the standards for effective capital counsel were no different in 1982 than they are now. Hamilton asserts that both the Ninth Circuit and the United States Supreme Court have rejected the notion that a different standard applied to capital counsel in the early 1980s, both acknowledging the importance of developing the defendant's background and character in order to make an individualized assessment of the appropriate penalty. *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Ainsworth v. Woodford,* 268 F.3d 868, 876–77 (9th Cir.2001); *Bean v. Calderon,* 163 F.3d

1073 (9th Cir.1998); *Karis v. Calderon,* 283 F.3d 1117 (9th Cir.2002) (citing *Williams (Terry) v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) applying the 1980 American Bar Association ("ABA") Standards in evaluating counsel's duty to investigate mitigation). Hamilton asserts the mitigation evidence in his case is similar to that in *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. 2527 (severe privation and abuse by alcoholic, absentee mother, physical torment, molestation and rape in foster care, diminished mental capacities, homelessness), which the Supreme Court found to be relevant to assessing moral culpability.

The State agrees that counsel must thoroughly investigate a defendant's background to prepare for the penalty phase, but contends the performance inquiry must determine whether counsel's actions were reasonable in light of all the circumstances. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The State argues the circumstances include the defendant's cooperation as well as the prevailing norms of practice. The State observes the standards of the ABA should only be viewed as guides, *id.,* and that the prevailing norms may be determined from the standard practices at the particular time and place of trial, *Wiggins,* 539 U.S. at 522, 123 S.Ct. 2527, but that no set of rules can account for the variety of circumstances counsel faces and should not restrict counsel's constitutional independence and wide latitude to make tactical decisions. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. Further, the State notes that the purpose of the ABA Standards is to improve the quality of legal representation, while the purpose of the Sixth Amendment right to effective assistance of counsel is to ensure that criminal defendants receive a fair trial. *Id.* at 689, 104 S.Ct. 2052.

The State argues the evidence establishes that despite trial counsel's urging to the contrary and warnings about the consequences, Hamilton insisted no mitigating evidence of his background or character be presented; Hamilton refused to entertain a mental defense or to undergo mental health testing and evaluation; insisted on an "all or nothing" defense of innocence at the guilt phase; and adamantly contended that if convicted he wanted to receive the death penalty. This was confirmed by the testimony of his trial counsel at the evidentiary hearing held in these federal habeas proceedings.

The State contends trial counsel persevered in his duty to investigate penalty phase mitigation despite the lack of cooperation by Hamilton and his friends and family, but the investigation produced little positive information. Trial counsel's investigation was not only hampered by Hamilton's refusal to discuss mitigation, but also by difficulty in obtaining information from other witnesses, whom trial counsel either could not speak to; did not provide any useful information; or provided negative information. The State argues that nothing in counsel's dealings with Hamilton suggested the need to consult a mental health professional. The State observes that records and reports provided after the evidentiary hearing show that defense counsel obtained Hamilton's juvenile record, his prior convictions, and his school records, and that inquiry was made about his foster care but no records were produced from providers.

The State asserts trial counsel made a tactical decision not to present evidence which had been gathered, including "character disorder" type evidence, in light of the circumstances; particularly Hamilton's strong objections to "mental" evidence; the absence of a history of serious mental pathology; and an offense which involved aggravated, pre-meditated, and purposeful activity. The State asserts that in light of

the results of trial counsel's investigation, it was reasonable to seek to present evidence of Hamilton's childhood through his mother.

The State argues that Hamilton's categorical denial of complicity in the murders during the guilt and penalty phases made his refusal to seek mitigation an understandable and consistent trial strategy. The State concludes that under the norms of practice in Tulare County in 1981 and 1982, trial counsel was not so deficient that he was not functioning as counsel guaranteed under the Sixth Amendment, especially where the psycho-social history evidence which has ultimately been discovered is weak and not particularly helpful to Hamilton.

The State observes that at the federal evidentiary hearing Hamilton conceded his consistent focus has been on the guilt phase of his trial and absence of complicity for the crime as he denied being the perpetrator. Both trial counsel and defense investigator Wells confirmed Hamilton's attitude was if he was found guilty he would rather receive the death penalty than spend the rest of his life in prison, which prompted Hamilton to refuse their repeated requests to provide background information. The State asserts Hamilton's motivation to forego a penalty phase defense was based on his assertion that if he was convicted, trial counsel had failed to do his job, and a sentence of death would entitle him to an automatic appeal to the California Supreme Court. *See* the State's Exhibit 5; December 2003 Evidentiary Hearing transcript ("EH") at 249–50.[27]

The State contends the record corroborates trial counsel's recollection over Hamilton's current assertion that he did supply all the requested information for the penalty phase and never said he did not want to present a penalty phase case. *See* the State's Exhibits 5 and 7; EH at 2379.

Hamilton contends there was ample evidence available to trial counsel which called for additional investigation which would have led to mitigating information, and that a rudimentary investigation would have alerted counsel to records revealing his mental health problems, the myriad of medications he was prescribed, and his bizarre behavior. Hamilton maintains the available evidence of his alleged suicide attempt, his problems at the jail, and his questions about his medication, should have prompted counsel to hire a mental health expert.

Hamilton argues a capital counsel's failure to investigate and present mitigating evidence is not justified by a lack of cooperation from his client. *Silva v. Woodford,* 279 F.3d 825, 847 (9th Cir.2002) (if a client forecloses certain avenues of investigation, it is an obligation, especially on capital counsel, to seek alternative sources); *Douglas v. Woodford,* 316 F.3d 1079, 1087 (9th Cir.2003) (counsel's obligation to obtain mitigating evidence is not excused by a client's lack of cooperation). Hamilton refers to Exhibits 133, 134 and 140, which include Kern County court records obtained in October of 1982, and a letter he wrote to trial counsel in September of 1982, that were discovered in counsel's files and submitted *after* the December, 2003 evidentiary hearing. Hamilton asserts these documents reveal mitigating evidence from his childhood which could have been used at trial and contradict trial counsel's assertion that Hamilton refused to provide useable information about his background.

The evidentiary hearing was re-opened at the State's request in order to allow

---

**27.** However, Hamilton was equivocal when asked at the evidentiary hearing if that was his strategy, replying "Not entirely," but conceding, "I can't deny that the [my] words are there." EH at 249–50, 252.

testimony by Hamilton, trial counsel, investigator Wells, and federal habeas counsel about the recently produced letter in Hamilton's handwriting, dated September 20, 1982, which provided details about his background. *See* Ex. 133D. Hamilton testified he provided this letter to trial counsel, but does not recall if it was mailed or given to counsel in person. September 2004 Reopened Evidentiary Hearing transcript ("REH") at 53.

Hamilton argues that even if trial counsel did not review, or even receive, Exhibit 133D, investigator Wells obtained records which would have led to the same mitigating evidence, had counsel only investigated the information they contained. Hamilton observes that the records included references to his parents' arrests for sexual abuse of his sister, his placement in various foster homes, the name of his social worker, and a report by the probation officer who interviewed him following his father's arrest. Hamilton asserts that in light of the information in these records, trial counsel had sufficient information to investigate mitigation even if Hamilton was uncooperative.

Hamilton asserts that even assuming trial counsel never received Exhibit 133D and that he had been as uncooperative as trial counsel characterized him, trial counsel still failed in his duty to investigate all avenues of mitigating evidence. Hamilton contends a defendant's insistence that penalty phase witnesses not be called does not eliminate trial counsel's duty to investigate mitigation, or to advise about the potential consequences of failing to present mitigating evidence. Hamilton argues that trial counsel's decision to call only Hamilton's mother was not a strategic decision made after full investigation of mitigation, but was a decision made because trial counsel had abdicated his responsibility to conduct a full investigation and failed to interview probation officers, foster parents, and mental health experts.

The State contends the September, 1982 letter (Ex. 133D) is completely contrary to an October, 1982 letter Hamilton wrote to his defense counsel in which Hamilton eschewed a penalty phase defense, and is also contradicted by statements Hamilton made at the time of trial in 1982. See Respondent's Ex. 4 (Hamilton's statement to the jury), Ex. 7 (Hamilton's statement at sentencing), and Ex. 8 (Hamilton's statement to probation officer). The State observes Hamilton did not mention preparing a written history during the December, 2003 evidentiary hearing, but testified instead that trial counsel took notes when Hamilton told him about his background. See EH at 205–06. Trial counsel testified he has no recollection of having ever seen the letter or having received it from Hamilton. REH at 26. The State urges that Exhibit 133D is unreliable, inferring it is a fabrication and should not be entitled to any weight.

Grave doubts about whether trial counsel ever received Exhibit 133D, and about Hamilton's credibility in 2003 as to the 1982 letters, do not have to be resolved because there is sufficient evidence to show that investigator Wells obtained records in October 1982 which contained sufficient information about Hamilton's background that would have led to similar mitigating evidence. *See* Exs. 133, 134 and 140.

The State asserts that reports of Hamilton's mental health problems in 1965 were only contained in his father's military records, and nothing alerted trial counsel of the need to obtain Hamilton's father's employment records. The State observes even Hamilton's *Strickland* expert Phillip Cherney hesitated to say a capital defense counsel must obtain a defendant's parents' employment records without any basis to

do so. EH at 176–77. The State disputes that trial counsel should have been put on notice of the need for a mental health evaluation by Hamilton's pre-trial alleged suicide attempt and use of antidepressant medication. The State asserts defense counsel was entitled to believe Hamilton's denial of an actual suicide attempt, and that Hamilton's understanding and interaction with trial counsel in the preparation for trial contradicted any suggestion that he was mentally impaired. EH at 278–80.

Hamilton concludes there was no strategic reason for trial counsel's failure to investigate and present substantial mitigating evidence of his father's depraved and sadistic behavior, his mother's complicity in the incest of his sister, his succession of stays in foster homes, his childhood behavioral and thought disturbances, and his attempted suicide while in jail. Hamilton contends the presentation of mitigation at his penalty trial was constitutionally deficient and he should be granted a new penalty trial.

The State observes trial counsel still believes Hamilton's mother was the best, and indeed only, way to present evidence of the family abuse and incest to the jury. EH, Thomas Transcript, at 20; State's Exhibit 2 at 25. When Mrs. Piper refused to discuss the abuse on the stand, trial counsel had no alternative way to present the evidence. State's Exhibit 1 at 2. The State asserts, however, that defense counsel had other strategies for the penalty phase, such as observing that the disposition of Carolyn's and Gilbert's cases could let them out of prison in as little as ten years when they were just as guilty of the murder, and arguing that Hamilton's life had value by reminding the jury of guilt phase testimony mentioning positive impressions about Hamilton, including that he was a good father.

Mr. Cherney testified at the evidentiary hearing that trial counsel should have developed a "theme," obtained a mental health evaluation, prepared a social history, and possibly obtained Hamilton's father's military records. EH at 72, 81, 104, 90. The State contends there is no established practice requiring capital counsel to develop a "theme," but asserts trial counsel did focus on a theme throughout the trial: that Carolyn Hamilton instigated the murder conspiracy and that Gilbert Garay shot Gwen. Trial counsel returned to this theme in his penalty phase argument when he contrasted the sentences of Carolyn and Gilbert with the sentence Hamilton was facing. The State observes trial counsel testified at the evidentiary hearing that preparing a social history and hiring a mental health expert was not done as a matter of course in 1981, and Mr. Cherney, Hamilton's *Strickland* expert, did not disagree.

That appellate cases decided twenty years later, when social history and mental health mitigation preparation is the standard of practice in death penalty trials, does not change the reality of capital defense practice in 1981 and 1982. Nor does it resolve defense counsel's testimony that he partially undertook social history and mental health analysis but Hamilton refused to permit him to present a mitigation defense.

The State admits the duty to make a reasonable investigation into potential mitigating evidence has never changed, but contends that the norms of practice which define "reasonableness" and the extent of mitigation evidence have evolved with experience and study. Trial counsel testified he would prepare for Hamilton's penalty phase differently today, but at the time he did the best he could in light of Hamilton's strong opposition and lack of cooperation. The State questions the validity of Mr. Cherney's opinion that trial counsel's investigation into mitigation was inadequate,

because Mr. Cherney does not know about the communications between trial counsel and Hamilton and because Mr. Cherney has no first-hand knowledge of the prevailing norms in Tulare County in 1981 and 1982. The State asserts both are critical to any assessment of trial counsel's performance, arguing conversations between counsel and defendant are particularly important when an uncooperative defendant later alleges ineffective representation at the penalty phase.

The State asserts Mr. Cherney is not an authority in the prevailing norms of practice in Tulare County in 1981 and 1982. Mr. Cherney was in private practice until 1987, and did not try a capital case to a jury until 1989 and 1990. Conversely, Hamilton's trial counsel began work for the Tulare County Public Defender's Office in 1979, has been appointed to twelve capital cases, tried six of those to a jury (of which Hamilton was the only one to receive the death penalty), and has been promoted to supervising attorney in the Public Defender's Office.

Trial counsel testified that the norms of practice in capital litigation have evolved since 1981. EH, Thomas transcript at 10–11, 24–25. He did not think there was a death penalty seminar before his appointment to Hamilton's case, but if there was it only lasted about two hours, where now the seminars occur annually and last three to four days. EH at 291. Trial counsel testified that attorneys in his office now assigned to capital cases hire an investigator and an outside consultant or mitigation specialist to investigate every aspect of a defendant's life. EH at 303, Thomas transcript at 11, 25, 28–29, 40–41. In 1981 this was not done, and trial counsel did not believe that a mitigation specialist even

existed then. EH, Thomas transcript at 29. At the time of Hamilton's trial, trial counsel's office did not hire a psychologist or psychiatrist as a matter of course in every capital case and did not prepare a psychosocial history, as they do today. EH at 133, 142, 282–83, 303, Thomas transcript at 10, 24–25, 40. In short, trial counsel testified that the techniques and practices of capital defense in Tulare County today are very different from 1981.

The State argues this case is like *Jeffries v. Blodgett,* 5 F.3d 1180, 1197–98 (9th Cir.1993) [28], which recognized the principle from *Strickland* that the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements and desires about how the trial be conducted. 466 U.S. at 691, 104 S.Ct. 2052. The State contends Hamilton's letter to trial counsel, and the statement he wished to read to the jury, unequivocally expressed his wish not to present mitigation evidence, entitling his trial counsel's decisions to additional deference. The State observes that a law review article relied on by Mr. Cherney discusses the effect of an uncooperative defendant, stating it may be impossible to construct a substantial mitigation case without the defendant's active assistance. *See* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U.L.Review 299, 321–22 (1983).

The State concludes that trial counsel properly sought Hamilton's assistance to prepare for the penalty phase early in his representation, but Hamilton refused to cooperate, insisted he did not want mitigation evidence presented, and made it clear he did not want counsel to investigate or

---

**28.** The State also cited *Hayes v. Woodford,* 301 F.3d 1054, 1067 (9th Cir.2002) for this argument, however that opinion was substituted after the State's brief was filed by *Hayes*

*v. Brown,* 399 F.3d 972 (9th Cir.2005) (granting habeas relief for presentation of false evidence).

present evidence of his family background, including the incest, by refusing to provide information or names of relatives. The State contends Hamilton's lack of cooperation prevented trial counsel from obtaining all the details of the abuse and problems in Hamilton's family, but that nevertheless trial counsel did investigate, interviewed witnesses and searched for records, trying to persuade Hamilton to cooperate, and making sure Hamilton understood the consequences of his failure to do so. The State argues trial counsel made a tactical decision to call Hamilton's mother to testify about his childhood because she had firsthand knowledge of the abuse. Counsel expected her to generate sympathy, and she had additional credibility due to her testimony for the prosecution at the guilt phase. Trial defense counsel reminded the jury of positive comments about Hamilton made by guilt phase witnesses and emphasized the relatively lenient sentences received by Hamilton's co-defendants as a result of their agreements with the prosecution. The State concludes Hamilton received reasonably effective assistance of counsel under the circumstances and the prevailing professional norms, and that Hamilton's failure to cooperate in his defense, which sabotaged counsel's efforts, cannot be used to obtain a reversal of his sentence.

*Analysis*

Standard practice in death penalty defense in Tulare County in 1982, the time of Hamilton's trial, was different from today. The law review article by Goodpaster, which Hamilton's *Strickland* expert relied on, was published in 1983. *Strickland*

was not decided until 1984. Although the ABA Standards published in 1980 stated capital counsel was required to thoroughly investigate a defendant's background, it is unclear what constituted a "thorough background investigation" at the time of Hamilton's trial. Trial counsel's testimony at the evidentiary hearing, that using a mitigation expert and obtaining a social history were not standard practices in 1982, was not contradicted by Hamilton's *Strickland* expert nor any other evidence. The Supreme Court in *Strickland* noted that prevailing norms of practice, as reflected in the ABA Standards, were only guidelines for determining reasonableness and could not take account of the variety of circumstances defense counsel faces or the range of legitimate decisions about representation. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052.

Three of the cases Hamilton cites, in support of his assertion that the standards regarding investigation in capital cases have not changed from the early 1980s to the present, confirm that in the early 1980s capital counsel had an obligation to conduct an investigation of a capital defendant's background.[29] In *Bean v. Calderon,* 163 F.3d 1073, 1078–79 (9th Cir.1998), counsel was found ineffective in a 1981 trial for failing to obtain testing of an accused which had been recommended by mental health experts and for not furnishing necessary information to testifying experts, which would have resulted in the presentation of evidence of mental retardation, post-traumatic stress disorder, brain damage, and the inability to form intent.

---

**29.** The fourth case Hamilton cites, *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *overruled on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), was tried in 1980, but the issue addressed by the Supreme Court involved jury instructions. The fifth case, *Williams (Terry) v. Taylor,* 529

U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding ineffective assistance of counsel for failure to investigate and present evidence of abusive and neglectful childhood, history of foster care, borderline retardation, and positive conduct in prison), was tried in 1986.

In *Ainsworth v. Woodford,* 268 F.3d 868 (9th Cir.2001), counsel was found ineffective in a 1980 trial because he could not provide a tactical reason for failing to investigate mitigation, failing to interview one witness until ten minutes before she was scheduled to testify, obtaining records but not examining them, failing to obtain evidence of a troubled childhood, drug use in the military and a 20 year addiction to drugs and alcohol which were documented in the probation report, and failing to present evidence of positive adjustment to prison. *Karis v. Calderon,* 283 F.3d 1117, 1135 (9th Cir.2002), held that counsel in a 1982 trial had a duty to investigate a capital defendant's background for possible mitigation, citing *Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. 2934, that the sentencer must be able to consider relevant evidence from the defendant's background and character. However, *Karis* also held that in 1982 capital counsel was not constitutionally compelled to perform the extent of family history research which is now often presented on appeal. *See* 283 F.3d at 1133–34.

In addressing what constituted a reasonable background investigation at the time of Hamilton's trial, in light of the circumstances of his case, trial counsel knew about Hamilton's troubled childhood and did investigate, but could not find witnesses who were available or willing to present that evidence. Trial counsel did obtain and reviewed the records which were available, and investigated Hamilton's background to the extent possible. No recommendation for further examination or testing was made by mental health experts. Trial counsel testified at the evidentiary hearing that Hamilton appeared to fully understand the proceedings, was active in preparing for the guilt phase, and that his refusal to assist with the penalty phase was not due to a lack of understanding or competence. EH at 280, Thomas transcript at 16, 43.

Trial counsel testified at the evidentiary hearing that the standard capital practice in the Tulare County Public Defender's Office at the time of Hamilton's trial did not include preparing a social history. EH, Thomas transcript at 28. This testimony distinguishes Hamilton's case from the facts in *Wiggins.* In *Wiggins,* trial counsel acknowledged that standard practice in capital cases at the time of trial in 1988 included the preparation of a social history report, but that he chose not to commission such a report despite the fact that funds were available. *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527.

 Considering the available evidence and the evidence presented at the evidentiary hearings, in light of the circumstances of the crime, trial counsel's investigation and presentation of mitigation was not deficient. Regardless of whether the allegations of Hamilton's lack of cooperation are true or not, either trial counsel or investigator Wells did interview the available witnesses, and no better, available witness about Hamilton's background and social history other than his mother was uncovered. Trial counsel could not talk to Carolyn and Gilbert because they were adverse parties represented by counsel. Counsel did obtain background information from Vicki and Uncle Marvin, the brother of Hamilton's father, but their testimony would have included information detrimental to Hamilton, and Gwen's family and other friends were either unwilling to talk to defense counsel or their testimony would have been more detrimental than helpful to Hamilton. The mental condition evidence known to defense counsel and his interactions with Hamilton, who did not want a "mental" defense, support counsel's lack of further pursuit of such evidence.

*Prejudice*

Even assuming arguendo, that trial counsel did render deficient performance

by failing to sufficiently investigate and present Hamilton's background and mental history in mitigation, Hamilton must also establish prejudice in order to prevail. In assessing prejudice, the evidence in aggravation is reweighed against the totality of available mitigating evidence. *Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527. Persons who commit crimes attributable to mental or emotional problems or a disadvantaged background may be less culpable than those with no excuse. *Boyde v. California,* 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

The mitigation presented in these proceedings which is most favorable to Hamilton is: childhood physical abuse by his father against him, his sisters, and mother; his father's sexual abuse, with his mother's assistance, of his sister Carolyn; the breakup of the family, twice; the first time when the extended family discovered the sexual abuse perpetrated against Carolyn and brought the children from Washington State to stay with relatives in California, followed by the family's reunion and a resumption of the sexual abuse (the time at which Hamilton learned about it), and the second time when both parents were arrested on sexual abuse charges; his transient foster care for three years during high school; and that he was prescribed medication for depression prior to trial.[30]

In aggravation, Hamilton's crime was premeditated and extremely cold-blooded. Hamilton attempted three days in a row to murder Gwen by shooting her with a shotgun. The first two attempts were to have her murdered by another in the presence of their children. He finally shot her himself. Jury deliberation was short at both guilt and penalty phases. RT 10:2334–46 (two hours for guilt); 2417–18 (about four hours for penalty, including lunch). The California Supreme Court commented on the characteristics of the crime in relation to the background evidence which Hamilton presented at trial:

> In addition, though other aggravating evidence was not overwhelming, the capital crimes themselves were exceptionally brutal. [Hamilton] planned the shotgun murder of his pregnant wife for reasons of personal convenience and financial gain. With cold-blooded determination, he personally executed his homicidal scheme, at point-blank range, after confederates failed to make good on earlier attempts to assassinate the victim. [Hamilton] knew his wife's death would also kill their unborn fetus and would render their four young children motherless. Though mitigating evidence that [Hamilton] suffered a difficult childhood was cause for sympathy, it was unlikely to carry persuasive weight against such a callous and calculated murder.

*Hamilton,* 48 Cal.3d at 1185, 259 Cal.Rptr. 701, 774 P.2d 730.

The cases cited by Hamilton, *Silva v. Woodford,* 279 F.3d 825 (9th Cir.2002) and *Karis v. Calderon,* 283 F.3d 1117 (9th Cir. 2002), are distinguishable. The murders in *Silva* and *Karis* were crimes of opportunity, by contrast the murder here was "exceptionally brutal" and deliberately calculated. The circumstances of Hamilton's crime are not the type mitigated by a possible lack of control or an inability to foresee the consequences of actions. Cases where counsel's failure to investi-

---

**30.** Although Hamilton asserts trial counsel should have discovered evidence that he experienced mental health difficulties, as discussed in Claim 21, *supra,* there is no credible evidence supporting these claims. Hamilton's conduct and demeanor at the federal evidentiary hearings, and his communications with, and motions to the Court, totally contradict these claims that he suffered from any mental impairments.

gate and present mitigation have been found prejudicial involve either less aggravating evidence, including the circumstances of the crime, or more significant mitigating evidence, or both.

The facts of the murder in *Wiggins* were less aggravating than the facts here: Wiggins was observed talking to the victim the last time she was seen alive and later that evening was in possession of the victim's car and credit cards. However, no other evidence tied him to the murder, and the victim's time of death could not be definitely established. *Wiggins v. State*, 352 Md. 580, 724 A.2d 1 (1999). There, the mitigating evidence was more compelling: Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother, suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care, spent time homeless, and had diminished mental capacities. *Wiggins*, 539 U.S. at 535, 123 S.Ct. 2527.

In *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir.2003), the jury heard about Douglas's aversion to the sight of blood and to his non-violent nature, and were given a very generalized sociological history, but did not hear about his abandonment as a child, having an abusive alcoholic foster father who locked him in the closet for hours at a time, having to scavenge for food, being beaten and gang-raped as a young man in a Florida jail, and did not hear expert testimony of possible significant mental illness and dysfunction. The *Douglas* expert could also have explained how the effects of inhaling solvents and an automobile accident may have exacerbated Douglas's pre-existing neurological deficit. In spite of the gruesome nature of the killing [31] for which Douglas was convicted, the jury did not hear a substantial amount of Douglas's social history and heard none of the evidence regarding his mental problems, which undermined confidence in the outcome of the penalty phase verdict.

Similarly, in *Silva v. Woodford*, 279 F.3d 825 (9th Cir.2002), where the defendant was convicted of abduction, robbery, and murder, trial counsel's failure to present significant evidence regarding the defendant's abusive childhood, mental illnesses, organic brain disorders, and substance abuse "was profoundly prejudicial." *Id.* at 847. Trial counsel's "failure to investigate Silva's background and to prepare evidence relating to his family history, mental health, and substance abuse problems resulted in an egregious failure to uncover and present a raft of potentially compelling mitigating evidence." *Id.* at 850.

In *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir.2001) (en banc), humanizing mitigation evidence was determined to have unique significance. Mayfield killed a woman and her son who had filed an auto theft complaint against him, and then killed another man who witnessed the murders. *Id.* at 918–19. Although "[t]he aggravating evidence against Mayfield was strong," and counsel had already solicited testimony from a psychiatrist about Mayfield's childhood diabetes, drug use, and psychological and social problems, counsel's failure to present the additional available mitigation evidence was prejudicial. *Id.* at 929–32. Counsel's failure to present experts in endocrinology and toxicology to explain the chemical impact of Mayfield's illness and drug abuse contributed to the finding of ineffective assistance. *Id.* at 932. Much of the potential mitigating testimony would have emphasized that Mayfield was a good, protective brother and generous nephew; not a violent person; that friends and family loved Mayfield and

---

31. Douglas lured two young women to the desert with promises of a photo shoot, then raped and brutally murdered them. 316 F.3d at 1091.

wished the jury to spare his life; and that friends and siblings understood Mayfield's years of drug and alcohol abuse and his poorly controlled diabetes had changed him. *Id.* at 931–32.

In *Landrigan v. Schriro,* 441 F.3d 638 (9th Cir.2006) (en banc), *cert. granted* —— U.S. ——, 127 S.Ct. 35, 165 L.Ed.2d 1013 (2006), a colorable claim was presented that counsel was ineffective for failing to present mitigating evidence, although Landrigan told his counsel that he did not want family members to testify who had been subpoenaed to testify. Landrigan actively sought to defeat counsel's efforts to present mitigation evidence by making statements that made matters even worse every time counsel attempted to place mitigating factors before the court. There, it was reasonably probable that, had counsel developed other mitigating evidence from different sources, the result might have differed. The murder in *Landrigan* involved stabbing and strangulation of an acquaintance in Arizona after escaping from prison in Oklahoma where he was incarcerated for murder. The state court pointed out, Landrigan himself was exceptional (unscrupulous, lacking in regard for others, and lacking in morals), *see State v. Landrigan,* 176 Ariz. 1, 859 P.2d 111, 117 (1993), but the available mitigating evidence of an alcoholic mother, an alcoholic adoptive mother, and a predisposition to violence, could have provided an explanation of his actions.

Conversely, in *Woodford v. Visciotti,* 537 U.S. 19, 25–26, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), the aggravating evidence of the circumstances of the crime (a cold-blooded execution-style killing of one victim and attempted execution-style killing of another, both during the course of a preplanned armed robbery) and the prior offenses (the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby) were so se-

vere that counsel's failure to present evidence of Visciotti's troubled family background and possible seizure disorder was not prejudicial. *Id.* at 26, 123 S.Ct. 357.

In *Allen v. Woodford,* 395 F.3d 979 (9th Cir.2005), *cert. denied sub nom., Allen v. Brown,* —— U.S. ——, 126 S.Ct. 134, 163 L.Ed.2d 137 (2005), counsel's failure to present potential humanizing, non-exculpatory mitigating evidence that Allen could be pleasant at times did not prejudice him because, even if counsel had presented the evidence, there was no reasonable probability that the jury would have weighed the evidence in favor of life rather than death, when Allen was convicted of murdering three people and conspiring to murder four others while already serving a life sentence for yet another murder, and he had a long history of orchestrating and committing violent robberies and burglaries. *Id.* at 1002–10. "None of the testimony portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur." *Id.* at 1007.

■ In the over fourteen years between Hamilton's removal from his parents' house in March of 1967 until Gwen's murder in November of 1981, Hamilton was frequently in trouble with the law, but generally for non-violent crimes such as theft. *See* Exs. 133C, E, F, G & I. While Hamilton's record does show instability (such as his failure to stay employed for any significant length of time), there is no evidence that the experiences of his childhood caused him to be violent or unable to control his impulses. Instead, the evidence shows that Hamilton cold-bloodedly planned to murder his wife, intending to share the life insurance proceeds with a killer Hamilton solicited, and that Hamilton eventually carried out the murder himself, and did this at the expense of his

unborn child's life to obtain the life insurance money and to clear the way for him to be with his mistress.

Like *Allen*, none of the evidence here portrays Hamilton as "a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur." 395 F.3d at 1007. The murder took three days in execution under circumstances arguably analogous to lying in wait. Even if evidence of Hamilton's complete background had been presented to the jury, the circumstances of the crime are such that confidence in the outcome is not undermined. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit *criminal acts that are attributable* to a disadvantaged background or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. at 382, 110 S.Ct. 1190 (emphasis added). Hamilton's deliberately premeditated criminal act is not the type attributable to a disadvantaged background or to emotional or mental problems. It is not reasonably probable that had all the available mitigating evidence been presented that the result of the proceeding would have been different in light of the very extensive evidence of ruthless premeditation. Trial counsel's performance was not prejudicial. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2b is denied on the merits.

### h. FAILURE TO OBJECT TO PROSECUTOR'S MISLEADING ARGUMENT THAT NO MITIGATION EQUALS AGGRAVATION

Hamilton asserts that defense counsel unreasonably failed to object to the prosecutor's argument that the absence of a mitigating factor was aggravating.

The California Supreme Court addressed the underlying claim on direct appeal, finding that the jury was adequately informed of its sentencing responsibility and the pertinent sentencing factors, was given the standard admonition to consider only "applicable" factors, and that defense counsel vigorously disputed the prosecutor's version of the aggravation-mitigation balance, urged the factors on which no evidence had been presented should be "ignored" or were "not an issue," reminded the jurors they alone decided the weight of each factor, and that any one mitigating factor could justify a life sentence "no matter how many other factors point the other way." *Hamilton*, 48 Cal.3d at 1185, 259 Cal.Rptr. 701, 774 P.2d 730. The California Supreme Court held there was only a minimal chance the jury was misled by the prosecutor's argument and found there was no reasonable possibility the prosecutor's improper argument affected the life-death determination since the mitigating evidence of a difficult childhood was unlikely to carry persuasive weight against such a callous and calculated murder. *Id.*

 As found in Claim 7a below, the prosecutor's erroneous argument, that the lack of mitigating evidence was aggravating, was not prejudicial as the jury was adequately informed of its discretion and admonished to consider only applicable factors. Further, defense counsel vigorously disputed the prosecutor's version of the aggravation-mitigation balance and reminded jurors they had the sole power to decide the weight of each factor and that any single factor could justify a life sentence.

Hamilton does not present any offer of proof or other allegation which indicates defense counsel's failure to object to the prosecutor's argument resulted in ineffective assistance of counsel. The record fairly supports the California Supreme

Court's denial of this claim. Claim 2h is denied on the merits.

#### i. FAILURE TO OBJECT TO PROSECUTOR'S ARGUMENT IN FAVOR OF THE DEATH PENALTY BASED ON MATHEMATICAL WEIGHING

 Hamilton asserts that defense counsel unreasonably failed to object to the prosecutor's argument that the death penalty should be imposed on the basis of a mathematical balance of mitigating and aggravating factors.

The California Supreme Court addressed the underlying claim on direct appeal, holding that although the prosecutor stressed during argument the existence of at least "nine" factors in aggravation and a maximum of "two" in mitigation, there was no reasonable possibility his comment would have led jurors to refrain from weighing the aggravating and mitigating evidence to decide which penalty was appropriate. *Hamilton*, 48 Cal.3d at 1181–82, 259 Cal.Rptr. 701, 774 P.2d 730.

As found in Claim 7a below, the prosecutor's argument referring to a numerical count of aggravating and mitigating factors was not prejudicial as the jurors were not mislead regarding their discretion and responsibility. Defense counsel reminded the jurors they needed to weigh the sentencing factors and that any single factor could justify a life sentence.

Hamilton does not make any offer of proof or other showing that defense counsel's failure to object to the prosecutor's argument resulted in prejudicial ineffective assistance of counsel. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2i is denied on the merits.

#### l. & m. INTER–CASE AND INTRA–CASE PROPORTIONALITY

Hamilton asserts defense counsel's failure to research and demonstrate that the death penalty was excessive based on inter-case and intra-case proportionality, compared to sentences in similar cases and compared to his alleged accomplices, resulted in ineffective assistance of counsel. Hamilton does not make any offer of proof or showing which indicates defense counsel's failure to research this issue resulted in ineffective assistance of counsel. This claim is foreclosed by *Pulley v. Harris*, 465 U.S. 37, 53, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (holding the jury's finding of a special circumstance with automatic review by the trial judge and the California Supreme Court, sufficiently limits the risk of arbitrariness and capriciousness without comparative proportionality review). The record fairly supports the California Supreme Court's summary denial of this claim. Claims 2l and m are denied on the merits.

#### ao. LACK OF PROFESSIONAL EXPERIENCE IN CAPITAL CASE TRIALS

 Hamilton contends that defense counsel provided him constitutionally ineffective assistance of counsel since this was his first capital trial, he had no assistance, and he was attempting to defend other capital murder trials and major felony cases during Hamilton's trial. *See* same claim (2ao) in guilt phase above. As above, Hamilton does not make any offer of proof or other showing that defense counsel was not competent to defend a capital defendant. At the time of his appointment to represent Hamilton, defense counsel had been a lawyer for six years, had been employed by the Tulare County Public Defender's Office for over two

years, had specialized in criminal defense, and had tried a murder case before a jury. EH at 280–81, Thomas transcript at 8. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2ao is denied on the merits.

### aq. FAILURE TO INTERVIEW KNOWN WITNESSES

Hamilton asserts that defense counsel was ineffective for failing to interview known witnesses. *See* same claim (2aq) in guilt phase above. Hamilton does not specify in the petition or identify in briefing which witnesses counsel knew of and did not interview, or what testimony they would provide. Nor does he present any offer of proof or evidence which demonstrates defense counsel's actions resulted in ineffective assistance of counsel. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 2aq is denied on the merits.

### 2. CLAIM 5: IMPAIRED RIGHT TO TRIAL BY JURY

#### g. IMPROPER PENALTY DETERMINATION

Hamilton asserts that from 1967 until the time of his trial in 1982 there had been only five executions nationwide, and none in California, so the jurors at his trial did not reasonably believe a death sentence would be carried out.

California's death penalty statute requires juries to find a special circumstance based on the facts of the crime and/or on the defendant's history, distinguishing those defendants convicted of first degree murder who are selected for death from those who are not. *Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 892, 894, 163 L.Ed.2d 723 (2006); *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The federal constitution requires

that sentence selection be made after "a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *Tuilaepa,* 512 U.S. at 971–73, 114 S.Ct. 2630; *Zant v. Stephens,* 462 U.S. 862, 878–79, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The consideration of aggravating and mitigating factors at the penalty phase, including the defendant's character and background and the circumstances of the crime, allows for an individualized determination of sentence, thereby directing and limiting the sentencer's discretion to avoid arbitrary and capricious action. *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The jury "need not be instructed how to weigh any particular fact in the capital sentencing decision," but is permitted unbridled discretion in determining the appropriate sentence. *Tuilaepa,* 512 U.S. at 979, 114 S.Ct. 2630; *Buchanan,* 522 U.S. at 276, 118 S.Ct. 757; *Stephens,* 462 U.S. at 875, 103 S.Ct. 2733. Finally, California's statute requires that the defendant either killed, intended to kill, or acted with reckless indifference to human life, so the death penalty is proportionate to the crime committed. *Enmund v. Florida,* 458 U.S. 782, 787, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

 Hamilton presents no evidence in support of this claim. The history of a state's application of its laws is not relevant to a reliable determination of penalty. In arriving at a verdict for the penalty phase, Hamilton's jury properly considered the circumstances of the crime, all evidence presented in mitigation including Hamilton's character and background, and

whether Hamilton killed, intended to kill or acted with reckless indifference to human life. Based on this evidence, defense counsel was not ineffective. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 5g is denied on the merits.

## 3. CLAIM 6: JUROR MISCONDUCT AT PENALTY

As reflected in the guilt phase analysis of this claim, jurors bring to their deliberations knowledge and beliefs about general matters of law and the facts that find their source in everyday life and experience. The effect of information received from extraneous sources is judged by a review of the entire record, and the determination of whether the extraneous information is nonprejudicial or is sufficient to justify habeas relief turns on whether there was a substantial and injurious effect or influence on the verdict. *Navarro–Garcia,* 926 F.2d at 821; *In re Carpenter,* 9 Cal.4th at 647, 38 Cal.Rptr.2d 665, 889 P.2d 985; *Lawson,* 60 F.3d at 612.

## b. & f. EXTRANEOUS INFORMATION REGARDING POSSIBILITY OF RELEASE AND PRISON CONDITIONS

Hamilton asserts that the jurors discussed, considered and relied on extraneous information that if they chose a sentence of life without possibility of parole, Hamilton would still be paroled within seven to twenty years. Hamilton presents the declarations of Irene Perkins, Allen Peoples, Mabel Heguigaray, Wendell Webb, and Geneva Gholston in support of this claim. Ex. 30 ¶ 5, Ex. 31 ¶ 6, Ex. 32 ¶ 5, Ex. 33 ¶ 7, and Ex. 34 ¶ 13.

Hamilton also asserts an unnamed juror, who had a brother in prison, observed that if Hamilton were sentenced to life he would probably be killed by other inmates because of the nature of the crimes, so they would probably be extending his life by sentencing him to death. Ex. 33 ¶ 7. Hamilton contends this extraneous information was prejudicial and improperly aggravated the offense by implying that the crime was reprehensible even by prison standards.

Federal Rule of Evidence 606(b) governs the admissibility of a statement by a juror to impeach the verdict.[32] Under Rule 606(b), a juror may not testify as to any matter or statement occurring during deliberations, or the effect of anything upon any juror's mind, emotions, or mental processes as influencing the verdict. An exception under Rule 606(b) allows juror testimony about whether extraneous prejudicial information was brought to the jury's attention or whether any improper outside influence was brought to bear.

█ The starting point is the rule that jurors' statements cannot be considered unless they concern the receipt of extraneous prejudicial information or the presence of outside influence. The declarations submitted in support of this claim deal with personal opinions of certain jurors expressed during deliberations. This is not a case involving extrinsic information imparted by a third party or obtained through an outside reference. *See Parker v. Gladden,* 385 U.S. 363, 363–65, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (misconduct for bailiff to tell the deliberating jury that defendant was a "wicked fellow" who was guilty and to tell another juror the Supreme Court would correct any improper guilty verdict); *Marino v. Vasquez,* 812 F.2d 499, 502–03, 505 (9th Cir.1987) (misconduct for juror to consult a dictionary for the definition of "malice"); *Bayramo-*

---

**32.** Pursuant to Federal Rule of Evidence 1101(e), the Federal Rules of Evidence apply to habeas corpus cases brought under 28 U.S.C. § 2254.

*glu v. Estelle,* 806 F.2d 880, 882–84, 887–88 (9th Cir.1986) (misconduct for juror to call a law librarian to inquire about the differences, including penalties, between first and second degree murder); *Gibson v. Clanon,* 633 F.2d 851, 852–55 (9th Cir. 1980) (misconduct occurred when one juror consulted an encyclopedia and another juror looked at a medical dictionary and both jurors shared the information during deliberations).

A careful review of the submitted juror declarations reveals no evidence of any extraneous information provided to the jury or any outside influence exerted on the jury. None of the allegations or declarations raise anything other than intra-jury matters. Rule 606(b) and related case law prohibit the court from considering the type of information upon which Hamilton bases his claims. Based on this evidence, defense counsel was not ineffective for failing to investigate and present evidence of juror misconduct. The record fairly supports the California Supreme Court's summary denial of this claim. Claims 6b and f are denied on the merits.

### e. CONSULTATION OF THE BIBLE AT PENALTY PHASE

Hamilton contends that Juror Lahoma Kuehl consulted the Bible to guide her decision to impose death, denying him the opportunity to refute or correct her interpretation of the scriptures and impermissibly interjecting religion as a guiding influence into the deliberations.

Hamilton submits the declaration of Juror Kuehl which states that when the trial became too stressful she handed her worries to God and she repeatedly read the Bible's teachings that the death penalty is an appropriate punishment which gave her guidance. Ex. 29 ¶ 4. Juror Kuehl also testified at the state evidentiary hearing, where she contended she was not a religious fanatic as the declaration made her

appear, and that she did not specifically consult the Bible regarding the death penalty. *In re Hamilton,* 20 Cal.4th at 291, 84 Cal.Rptr.2d 403, 975 P.2d 600. Juror Kuehl admitted at the evidentiary hearing that she did study the Bible daily during the trial. *Id.* at 292, 84 Cal.Rptr.2d 403, 975 P.2d 600.

■■■ No clearly established federal rule governs the consultation of the Bible during a capital sentencing jury deliberation. *Robinson v. Polk,* 444 F.3d 225 (4th Cir. 2006) (Wilkinson, J., concurring in denial of rehearing en banc). Juror Kuehl made no mention, either in her declaration or at the state evidentiary hearing, that she discussed biblical passages and/or beliefs with other jurors. Hamilton has made no allegation that a Bible was present in the jury room during deliberations, or that Juror Kuehl's actions had any impact on the jury's decision. There is no suggestion the jury disregarded the law or the court's instructions, and instead referred to or applied biblical law.

Based on this evidence, defense counsel was not ineffective for failing to investigate and present evidence of juror misconduct. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 6e is denied on the merits.

### 4. CLAIM 7: PROSECUTORIAL MISCONDUCT—IMPROPER ARGUMENT AT PENALTY; LACK OF MITIGATION IS AGGRAVATING

#### a. MATHEMATICAL COMPARISON OF MITIGATION AND AGGRAVATION ENCOURAGED

Hamilton asserts the jury was led to believe by instructions, voir dire questioning and prosecutorial argument that they were to determine the applicability of the death penalty based on a mathematical comparison of aggravating and mitigating

circumstances. The California Supreme Court rejected this claim on direct appeal, holding that prosecutorial argument which simply restates the statutory language that death shall be imposed if aggravation outweighs mitigation is insufficient to mislead the jury or to misstate the law. *Hamilton,* 48 Cal.3d at 1181, 259 Cal.Rptr. 701, 774 P.2d 730. The state court found the prosecutor did not suggest the jury merely count factors, but told them to "weigh" the factors and to "balance them." *Id.* at 1182, 259 Cal.Rptr. 701, 774 P.2d 730. Although observing that it might have been better for the prosecutor not to have emphasized the numerical count, the state supreme court saw no reasonable possibility his comment led jurors to refrain from weighing the aggravating and mitigating evidence to decide which penalty was appropriate. *Id.*

Hamilton further alleges, as he did on his state direct appeal, that the prosecutor's argument was erroneous as he argued the absence of evidence as to mitigating factors constituted aggravation. See Claim 19e below. The California Supreme Court rejected this claim despite finding error in the prosecutor's argument (that the absence of evidence on factors (d), (e), (f), (g), (h), and (j) of California Penal Code section 190.3 (" § 190.3") was aggravating), because the jury was adequately informed of its responsibility and the pertinent factors, the jury was admonished to consider only "applicable" factors, and defense counsel vigorously disputed the prosecutor's version of the aggravation-mitigation balance and reminded the jurors they had the sole power to decide the weight of each factor and any one mitigating factor could justify a life sentence. *Hamilton,* 48 Cal.3d at 1184–85, 259 Cal.Rptr. 701, 774 P.2d 730. The California Supreme Court concluded that any chance the jury was misled by the prosecutor's argument was minimal, especially in light of the excep-

tionally brutal character of the crimes. *Id.* at 1185, 259 Cal.Rptr. 701, 774 P.2d 730.

■ A prosecutor may properly argue that the jury can consider the lack of evidence as to mitigating factors. *Tuilaepa,* 512 U.S. at 975–81, 114 S.Ct. 2630. Under California law it is error for a prosecutor to argue that such a lack of evidence of mitigating factors constitutes an aggravating factor. *People v. Davenport,* 41 Cal.3d 247, 289–90, 221 Cal.Rptr. 794, 710 P.2d 861 (1985).

Here, the prosecutor stated in closing argument there were two factors in mitigation and nine factors in aggravation, but then immediately told the jury, "Your duty as judges at this time I would submit to you is to weigh the factors in aggravation with the factors in mitigation," RT 10:2395, implying that more than mechanical counting was required. Defense counsel also told the jury that they alone would decide the weight and importance of each factor, and that any single factor could justify a life sentence. *Id.* at 2403.

Review of the state record reveals that the California Supreme Court was correct in finding no prejudice from the prosecutor's erroneous argument. The jurors were not misled about their discretion and responsibility to determine the appropriate penalty under all the evidence. Since both the prosecutor and defense counsel reminded the jurors they needed to find that aggravation outweighed mitigation, the prosecutor's statement did not render the proceedings so unfair "as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181, 106 S.Ct. 2464.

Based on this evidence, defense counsel was not ineffective for failing to object to the instruction, voir dire questioning, or argument. The record fairly supports the California Supreme Court's denial of this claim. Claim 7a is denied on the merits.

### b. DEATH MANDATORY IF AGGRAVATION OUTWEIGHED MITIGATION

Hamilton contends the court instructed, and the prosecutor argued, that if the jury found aggravating factors outweighed mitigating factors it was *mandatory* they impose a death sentence. Although Hamilton concedes this claim is foreclosed by *Boyde v. California*, 494 U.S. at 374–77, 110 S.Ct. 1190, he asserts in this case the mandatory instruction was unconstitutional because the argument of the prosecutor reinforced the notion that the jury had no discretion once a mathematical counting had taken place and they were not told they had the ultimate sentencing discretion. Hamilton contends the "shall impose" instruction is only permissible if the jury is informed of the requirement of an individualized sentencing determination.

As found above, the prosecutor's statement about the numerical count of the § 190.3 factors did not mislead the jury as to its duty to weigh the evidence. The purported "mandatory" instruction was not rendered unconstitutional. Based on this evidence, defense counsel was not ineffective for failing to object to the instruction or argument. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 7b is denied on the merits.

### c. IMPLICATION JURY WASN'T RESPONSIBLE FOR IMPOSING DEATH PENALTY

Hamilton contends jury instructions and argument led the jurors to believe their role was limited strictly to finding the facts as to aggravation and mitigation, and that the law required the death penalty if more aggravation existed than mitigation.

Hamilton points to nothing other than the prosecutor's statement, reviewed in Claim 7a above, to support his argument that the jury's duty was lessened. The instructions as a whole and the arguments of counsel adequately informed the jury of its responsibility.

Based on the record, defense counsel was not ineffective for failing to object to the instruction or argument. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 7c is denied on the merits.

### d. INDICATION HUNG JURY WAS IMPROPER

Hamilton asserts that voir dire questioning and statements of the court led the jurors to believe it would be improper to have a hung jury, and that repeated instructions that the jurors work together exacerbated this misunderstanding.

Hamilton does not identify what questions, statements and/or instructions allegedly misled the jury about the failure to reach unanimity. A review of the record does not reveal any statement by either counsel or the judge which impaired the jury's understanding of their responsibility.

Based on this evidence, defense counsel was not ineffective for failing to object to the voir dire questioning or court statements. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 7d is denied on the merits.

### 5. DEATH PENALTY ISSUES

### a. CLAIM 16: CALIFORNIA DEATH PENALTY UNCONSTITUTIONAL AS ADMINISTERED

(1) SUBCLAIM a: UNBRIDLED PROSECUTORIAL DISCRETION

Hamilton asserts California's death penalty statute is unconstitutional because prosecutors' unbridled discretion whether to seek the death penalty renders the re-

sult arbitrary and capricious. He further contends that discretion is improperly influenced by a prosecutor's professional and political aspirations which benefit by compiling a record of capital convictions, especially as here in cases occurring during an election year.

This argument has been explicitly rejected by the Supreme Court. *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality of Stewart, Powell, and Stevens, JJ.). The Court stated the presence of discretionary stages does not render a death sentence unconstitutional and in fact indicated the opposite, that the absence of discretion would be unconstitutional. *Id.* at n. 50, 96 S.Ct. 2909. "Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." *Id.* at 225, 96 S.Ct. 2909 (White, J. concurring).

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 16a is denied on the merits.

(2) SUBCLAIM b: CONFINEMENT ON DEATH ROW IS CRUEL AND UNUSUAL

Hamilton asserts California's death penalty statute is unconstitutional as the severe conditions of and psychological strain from confinement on death row inflicts unnecessary physical and psychological pain, resulting in cruel and unusual punishment.

If Hamilton's claim is that the conditions of his confinement on death row make his sentence cruel and unusual, he has not alleged sufficient facts to state a prima facie case. Generally a challenge to conditions of confinement is not cognizable on habeas corpus. *Beardslee v. Woodford*, 395 F.3d 1064, 1068–69 (9th Cir.2005) (citing *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir.1991)) (habeas corpus proceedings are proper mechanism to challenge legality or duration of confinement and civil rights action the proper method to challenge conditions of confinement). However, an Eighth Amendment claim may be stated if the conditions of confinement result in a denial of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), through the "deliberate indifference" by prison personnel or officers. *Wilson v. Seiter*, 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The evaluation of claims of cruel and unusual punishment under the Eighth Amendment has both objective and subjective components, so reviewing courts must ask both if "the officials act[ed] with a sufficiently culpable state of mind" and if the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation. *Id.* at 298, 303, 111 S.Ct. 2321; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996). Hamilton has not alleged any facts showing a denial of "the minimal civilized measure of life's necessities," or that "deliberate indifference" by prison personnel or officers caused such deprivation.

If Hamilton is alleging psychological strain results from extended confinement on death row, that claim is foreclosed by Ninth Circuit precedent. Lengthy incarceration on death row during the pendency of capital appeals does not violate the Constitution's prohibition against cruel and unusual punishment. *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir.1995) (en banc). Although this claim is raised in Hamilton's first federal petition, unlike McKenzie's claim which was raised in a subsequent petition along with a request for a stay of execution, the reasons for rejecting the claim remain the same. "A defendant must not be penalized for pursu-

ing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights." *McKenzie v. Day,* 57 F.3d 1461, 1466 (9th Cir.1995) (panel opinion).

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 16b is denied on the merits.

### (3) SUBCLAIM c: DISCRIMINATORILY IMPOSED DEATH PENALTY

Hamilton asserts California's death penalty statute is unconstitutional since it has been discriminatorily imposed against poor males with white victims.[33] The same argument, proffered by Justice Blackmun, was rejected by the Supreme Court during review of the constitutionality of § 190.3(a), the circumstances of the crime sentencing factor. *Tuilaepa v. California,* 512 U.S. at 978–79, 991–93, 114 S.Ct. 2630. Hamilton's claim is foreclosed.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 16c is denied on the merits.

### b. CLAIM 17: DISPROPORTIONATE AND EXCESSIVE PENALTY

█ Hamilton asserts that his death sentence is unconstitutional because, as applied, it is disproportionate and excessive as compared to his co-defendants and alleged co-conspirators and also as compared to others who commit similar crimes.

The California Supreme Court reviewed this claim on direct appeal, finding that the federal Constitution did not require either intra-case nor inter-case proportionality review. *Hamilton,* 48 Cal.3d at 1187, 259 Cal.Rptr. 701, 774 P.2d 730. Although the California Constitution prohibits punish-

ment which is disproportionate to culpability, the state court determined that in view of the circumstances of the crime Hamilton's sentence was not disproportionate. *Id.*

The Eighth Amendment does not require comparative proportionality review. *Harris,* 465 U.S. at 50–51, 104 S.Ct. 871. California's statute provides sufficient protection against arbitrariness through procedures which require a special circumstance finding, the consideration of relevant aggravating and mitigating factors, an automatic motion for new trial, and an automatic appeal. *Id.* at 51–53, 104 S.Ct. 871.[34] Further, the jury here found that Hamilton was the one who actually shot Gwen and did so in order to obtain the insurance proceeds on her life.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 17 is denied on the merits.

### c. CLAIM 18: VAGUE AND OVERBROAD AGGRAVATING FACTORS

█ The Eighth Amendment requires that a jury's capital sentencing decision involve an individualized determination, that is, consideration of relevant mitigating evidence including the character and record of the defendant and the circumstances of the crime, but does not require instruction on how to weigh any particular fact. *Tuilaepa,* 512 U.S. at 972, 979, 114 S.Ct. 2630; *Buchanan,* 522 U.S. at 276, 118 S.Ct. 757. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty," the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether

---

**33.** Hamilton is white.

**34.** Although Harris was sentenced under the 1977 statute, the procedures which the United States Supreme Court found sufficient to protect against arbitrariness are all present in the 1978 statute as well.

death is the appropriate punishment, is not arbitrary and capricious. *California v. Ramos*, 463 U.S. 992, 1008–09, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

#### (1) SUBCLAIM a: FACTOR (a)

Hamilton asserts that § 190.3(a) incorporates several vague and overbroad special circumstances from the list of special circumstances in California Penal Code section 190.2 (" § 190.2") as aggravating factors: *i.e.*, the uncertainty that the multiple murder special circumstance applies to one act which results in the murders of a mother and a fetus; the vagueness and overbroad nature of the financial gain special circumstance.

This claim is foreclosed by *Tuilaepa v. California*, which upheld the constitutionality of § 190.3(a), the actual circumstances of the murder as an aggravating factor; and *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. at 894, 163 L.Ed.2d 723, holding the impact of the inclusion of any true special circumstance applying factor (a) was inconsequential and could not fairly be regarded as a constitutional defect in the sentencing process. The Court in *Tuilaepa* found factor (a) to be a "constitutionally indispensable part of the process" in capital cases, 512 U.S. at 976, 114 S.Ct. 2630, and its open-ended subject matter an appropriate part of the jury's broad discretion in determining the sentence. *Id.* at 978–79, 114 S.Ct. 2630.

The application of factor (a) here does not give rise to federal constitutional error since the totality of the instructions and both counsels' arguments made clear the jury's duty. *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (finding no constitutional error in capital sentencing scheme which permits the jury to consider in sentence selection an element of the underlying crime); *People v. Holt*, 15 Cal.4th 619, 699–700, 63 Cal.Rptr.2d 782, 937 P.2d 213 (1997). Although the prosecutor here gave a numerical count of the § 190.3 factors, he in substance also told the jury more than mechanical counting was required, and defense counsel told the jury they alone could decide the weight and importance of each factor and any single factor could justify a life sentence. See Claim 7a above.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 18a is denied on the merits.

#### (2) SUBCLAIM b: FACTOR (b)

Hamilton contends § 190.3(b), prior criminal activity which used or threatened violence, is vague and overbroad since it can be interpreted either to only apply to prior acts or to include the subject murder. This argument, that the jury should have been instructed the violent criminal activity referred to in (b) excludes the circumstance of the subject crime, thus preventing double counting of the guilt phase offense in both (a) and (b), is foreclosed by *Tuilaepa*, 512 U.S. at 976–77, 114 S.Ct. 2630 (holding factor (b) is not unconstitutionally vague). *See Bonin*, 59 F.3d at 848.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 18b is denied on the merits.

#### (3) SUBCLAIM c: FACTOR (j)

Hamilton asserts that § 190.3(j), whether the defendant was an accomplice or minor participant in the murder, is vague and overbroad since it can be interpreted, as he alleges it was in his case, to constitute an aggravating factor which would automatically apply to every murder. The California Supreme Court has indicated in numerous cases that factor (j) is only mitigating and inapplicable unless the defendant was an accomplice whose participation was relatively minor. *People v. Proctor*, 4 Cal.4th 499, 553, 15 Cal.Rptr.2d

340, 842 P.2d 1100 (1992). That the state court has approved the treatment of factor (j) as an aggravating factor where a defendant was the sole participant, *id.*, does not transform it into an automatic aggravating factor for every murder. The jury properly determined Hamilton's role in the offense.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 18c is denied on the merits.

(4) SUBCLAIM d: FACTOR (k)

Hamilton alleges § 190.3(k), any other circumstance, even though not a legal excuse, that extenuates the gravity of the crime, is vague as it does not clearly instruct jurors they can consider anything offered in mitigation, including a defendant's background and character.

The California Supreme Court rejected this claim on direct appeal. *Hamilton*, 48 Cal.3d at 1182, 259 Cal.Rptr. 701, 774 P.2d 730. Because this case was tried before *People v. Easley*, 34 Cal.3d 858; 878, n. 10, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), Hamilton's jury was not instructed that factor (k) includes not only circumstances which extenuate the gravity of the crime, but also any other aspect of the defendant's character or background that he offers as a basis for a life sentence. *Hamilton*, 48 Cal.3d at 1182, 259 Cal.Rptr. 701, 774 P.2d 730. The state court's review of Hamilton's sentence considered whether, because such an instruction was not given, the jury may have been led to fail to consider Hamilton's mitigating character and background evidence. *Id.* The state court found, based on the arguments of the prosecutor and defense counsel, that the jury was not misled into believing it could not consider Hamilton's mitigating background and character evidence. *Id.* at 1182–83, 259 Cal.Rptr. 701, 774 P.2d 730.

The United States Supreme Court has held that an instruction based on the "unadorned" version of factor (k) is not errone-

ous. *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190. The Court found it was not reasonably likely a jury would think the instruction was limited to evidence related to the crime or that it prevented the consideration of background and character. *Id.* at 381–82, 110 S.Ct. 1190.

The record fairly supports the California Supreme Court's denial of this claim. Claim 18d is denied on the merits.

(5) SUBCLAIM e: FACTORS NOT IDENTIFIED AS AGGRAVATING OR MITIGATING

Hamilton asserts that § 190.3 is unconstitutionally vague because it fails to identify which factors are to be considered aggravating and which are to be considered mitigating.

 This claim is foreclosed by *Tuilaepa v. California.* "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.... [but] is free to consider a myriad of factors ... [and] given unbridled discretion in determining whether the death penalty should be imposed." 512 U.S. at 979–80, 114 S.Ct. 2630.

The record fairly supports the California Supreme Court's summary denial of this claim. Claim 18e is denied on the merits.

d. CLAIM 19: INFLATED AGGRAVATION/UNCONSTITUTIONAL STATUTE

(1) SUBCLAIM a: DOUBLE/TRIPLE COUNTING

Hamilton asserts certain acts were counted more than once, as elements of the crime, and/or special circumstances, and in aggravation, violating double jeopardy. *See* Claim 18b above. Hamilton contends this double-counting resulted in "automatic aggravating circumstances," making California's death penalty statute

in effect mandatory, especially when combined with: (i) the mandatory language of the statute, *see* Claim 7b above; (ii) the erroneous double counting of multiple murder special circumstance; (iii) the erroneous instruction and argument that the absence of mitigation was aggravating, *see* Claim 7a above; and (iv) the invitation by statute, the court, prosecutor and defense counsel to determine the sentence based on mathematical comparison of aggravation and mitigation. *See* Claim 7a above.

Hamilton's claim that the charging of two separate multiple-murder special circumstances requires reversal, was rejected by the California Supreme Court on direct appeal. The Court found the duplicate charging erroneous, but found no basis to reverse the penalty as there appeared no reasonable possibility the jury gave significant independent aggravating weight to the fact that two multiple-murder special circumstances, rather than one, had been charged and found. *Hamilton*, 48 Cal.3d at 1180–81, 259 Cal.Rptr. 701, 774 P.2d 730. Hamilton asserts the error of charging two multiple-murder special circumstances requires reversal because California's statute calls for weighing and the California Supreme Court did not re-weigh the aggravating and mitigating factors, as required by *Stringer v. Black*, 503 U.S. 222, 229–30, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

The United States Supreme Court recently held California is a non-weighing state. *Sanders*, 546 U.S. 212, 126 S.Ct. at 893, 163 L.Ed.2d 723. However, the Supreme Court found the weighing/non-weighing scheme needlessly complex and incapable of providing for the full range of variations, and so imposed the following rule: "An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing

process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Id.* 546 U.S. 212, 126 S.Ct. at 891–892, 163 L.Ed.2d 723.

California's eligibility factors, the special circumstances of § 190.2, are designed to satisfy the narrowing requirement of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). *See Sanders*, 546 U.S. 212, 126 S.Ct. at 892, 163 L.Ed.2d 723. If the jury finds one charged special circumstances true, a penalty trial follows at which the jury must "take into account" the *separate* list of sentencing factors from § 190.3 which include the "circumstances of the crime." *Id.* 546 U.S. 212, 126 S.Ct. at 892–93, 163 L.Ed.2d 723. Even if the direction in § 190.3(a) to consider "the existence of any special circumstances found to be true" placed special emphasis upon the facts and circumstances relevant to an invalid factor, that impact "cannot fairly be regarded as a constitutional defect in the sentencing process." *See Sanders*, 546 U.S. 212, 126 S.Ct. at 894, 163 L.Ed.2d 723; *Zant v. Stephens*, 462 U.S. 862, 889, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

■■ Applying *Sanders'* analysis to the special circumstances Hamilton's jury found true, the California Supreme Court invalidated one of the multiple murder special circumstances; but each of the remaining two special circumstances, one of multiple murder and one of murder for financial gain, is independently sufficient to uphold Hamilton's death sentence. The facts and circumstances considered by the jury in support of the valid special circumstances, properly admitted under the "circumstances of the crime" sentencing factor, were the same facts and circumstances supporting the invalid special circumstance. *See Sanders*, 546 U.S. 212, 126 S.Ct. at 893–94, 163 L.Ed.2d 723.

The remaining allegations underlying this claim have been rejected above in Claims 7 and 18. The federal constitution requires that sentence selection be made after "a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Buchanan*, 522 U.S. at 276, 118 S.Ct. 757; *Tuilaepa*, 512 U.S. at 971–73, 114 S.Ct. 2630; *Stephens*, 462 U.S. at 878–79, 103 S.Ct. 2733. The sentencer may not be prevented from considering, nor refuse to consider, any such mitigating evidence. *Buchanan*, 522 U.S. at 276, 118 S.Ct. 757; *Eddings v. Oklahoma*, 455 U.S. 104, 114–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). The jury "need not be instructed how to weigh any particular fact in the capital sentencing decision," but is permitted unbridled discretion in determining the appropriate sentence. *Tuilaepa*, 512 U.S. at 979, 114 S.Ct. 2630; *Buchanan*, 522 U.S. at 276, 118 S.Ct. 757; *Stephens*, 462 U.S. at 875, 103 S.Ct. 2733. Hamilton provides no evidence, nor does review of the record indicate, that the jury's consideration of mitigating evidence was impacted. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 19a is denied on the merits.[35]

**(2) SUBCLAIM e: ARGUING THAT ABSENCE OF MITIGATION WAS AGGRAVATING**

Hamilton contends his death sentence is unreliable since the prosecutor was allowed to argue that the absence of evidence on a mitigating factor constitutes aggravation. See Claim 7a above. Hamilton asserts this error created an unconstitutional presumption of the appropriateness of death and the existence of aggravation, falsely inflated the number of aggravating circumstances, confused the jurors, thwarted the requirement of carefully channeling their sentencing discretion, and created aggravating circumstances which bore no rational relationship to the question of whether a man should live or die.

As discussed in Claim 7a above, the *Davenport* error in the prosecutor's argument was harmless. The record reveals the jurors were not misled about either their discretion or their responsibility to determine the appropriate penalty under all the evidence. In light of the entire record, the prosecutor's erroneous argument did not render the proceedings unfair. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 19e is denied on the merits.

**e. CLAIM 20: IMPROPER AGGRAVATION**

■ Hamilton asserts his death sentence was improperly imposed because unconstitutional prior convictions were relied on to prove aggravating factors, and evidence of aggravation not enumerated in § 190.3 was considered.

The prosecutor admitted into evidence during the penalty phase one of Hamilton's

---

**35.** Hamilton raised three other challenges to the death penalty statute for which he provides no factual basis or argument: subclaim (b) that no instruction identifying the mitigating factors which were supported by some evidence was given; subclaim (c) that improper classifications differentiate between acts and mental state which may be considered in aggravation or mitigation from those that may not bear a significant relationship to the retributive and deterrent justifications of the death penalty; and subclaim (d) that a death sentence may be imposed on the basis of a "personal characteristic" which is not a rational or legitimate basis and lacks sufficient justification for imposing death. No explanation is given which defines the challenged classifications under subclaim (c) or the challenged personal characteristic under subclaim (d). Subclaims (b), (c) and (d) are denied on the merits as they fail to state a prima facie claim for relief.

prior conviction for grand theft. RT 10:2373. California Penal Code section 190.3(c) lists prior convictions as a valid sentencing factor. Hamilton does not specify in the petition or his briefing how his prior grand theft conviction was unconstitutional, or what aggravating evidence not enumerated in § 190.3 was considered. Based on these allegations, defense counsel was not ineffective for failing to object to evidence submitted in aggravation. The record fairly supports the California Supreme Court's summary denial of this claim. Claim 20 is denied on the merits.

### 6. CLAIM 22: CUMULATIVE ERROR

Hamilton argues that the cumulative effect of the errors in the guilt and penalty phases of his trial resulted in an unconstitutional death sentence.

 Where no claim establishes a violation of constitutional law, there is no reason to grant habeas relief based on cumulative error. *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996). *See also Hoxsie v. Kerby,* 108 F.3d 1239, 1245 (10th Cir. 1997) ("Cumulative-error analysis applies where there are two or more actual errors"). Two errors at the penalty phase exist here, as also found by the California Supreme Court, *see Hamilton,* 48 Cal.3d at 1186, 259 Cal.Rptr. 701, 774 P.2d 730, both of which were individually found to be harmless: the prosecutor's argument that lack of mitigation was aggravating (Claim 7a), and the two special circumstances for multiple murder (Claim 19a). Considering these errors cumulatively, even assuming arguendo, the additional possible error that trial counsel's performance at the penalty phase was deficient for failing to investigate and present more mitigating evidence (Claim 2b), prejudice is not established. The record provides substantial support for both of the jury's conclusions: that Hamilton with cold-blooded premeditation planned and endeavored three times over three days to murder his wife and unborn child. When co-conspirators were twice unable to perpetrate the shotgun killing, Hamilton himself carried out the execution by shooting his wife, killing her and their unborn child. A jury was justified on the facts finding that death was the appropriate sentence. Claim 22 is denied on the merits.

### VII. CONCLUSION

Hamilton, who has never accepted responsibility for the murder, continues to maintain that someone else, namely his sister Carolyn and her friend Gilbert Garay killed Gwen without his knowledge or participation. This defense was fully presented at trial, and it was rejected by the jury. Hamilton's own statements and other evidence, such as the testimony of his girlfriend, Brenda Burns; the inconsistencies in Hamilton's statements to police and his prevarication about a Canadian suspect; all indicate that Hamilton was involved in the shooting. The testimony of Hamilton's mother and his sister Vicki corroborate Carolyn's and Gilbert's accounts of Hamilton's plan: that for two days in a row Hamilton drove his wife and children on a country road to create the opportunity for Carolyn and Gilbert to shoot Gwen. When they did not act, Hamilton, on the next night took over and himself shot and killed Gwen and his unborn child. No evidence has been presented of any error which shows a "substantial and injurious effect or influence in determining the jury's verdict" or the deprivation of a fair trial in violation of Hamilton's right to due process. *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710.

Hamilton cold-bloodedly planned to murder his wife; intended to share the life

insurance proceeds with the actual killer; eventually carried out the murder himself; and did this at the expense of his unborn child's life to obtain the life insurance money and to clear the way for him to be with his mistress. In light of the very extensive evidence of ruthless premeditation, it is not reasonably probable, under any scenario, that there was a substantial or injurious effect or injury to the jury's verdict, or a deprivation of a fair trial in violation of the right to due process. *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710.

## VIII. CERTIFICATE OF APPEALABILITY

 Appeal from an order denying habeas relief lies only if leave to appeal is obtained. The AEDPA amended 28 U.S.C. § 2253 to require a "certificate of appealability" ("COA"), which may be granted only upon a "substantial showing of the denial of a constitutional right," and must issue on a claim specific basis. A substantial showing of the denial of a constitutional right includes showing that reasonable jurists could debate whether (or for that matter agree that) the petition should have been resolved in a different manner or that the issues presented deserve encouragement to proceed further. *Slack v. McDaniel,* 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 and n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

*Slack* held the § 2253 certificate of appealability requirement has retroactive effect to petitions filed before the AEDPA's effective date when the appeal commences after the effective date. *Id.* at 481, 120 S.Ct. 1595. Hamilton is subject to certificate of appealability requirements of the AEDPA.

Although there is no showing of the denial of a constitutional right for any claim advanced, there are two issues where jurists of reason may differ. A certificate of appealability shall issue on Claim 2b, ineffective assistance of counsel for failure to investigate and present mitigation at penalty; and, since the law on this issue is currently unclear in the Ninth Circuit, on Claim 3b(4) and related Claim 8, prosecutorial misconduct as to Gilbert's plea agreement, testimony and subsequent declaration.

## IX. ORDER

For the reasons stated above, IT IS ORDERED:

1. Hamilton's petition for writ of habeas corpus is DENIED on the merits on every ground advanced. All declarations and evidentiary submissions, including testimony and exhibits received at the evidentiary hearing, have been fully considered, including the offers of proof.

2. A certificate of appealability shall issue on Claim 2b and Claim 3b(4) and related Claim 8.

3. Judgment shall be entered for RESPONDENT, the State, and against PETITIONER, Michael Allen Hamilton.

IT IS SO ORDERED.